**STATE of Louisiana**

**v.**

**Terry SPEAKS a/k/a Allen Rice a/k/a Leslie Allen Rice a/k/a Leslie Rice**

**NO. 16–KA–163**

Court of Appeal of Louisiana, Fifth Circuit.

December 07, 2016

COUNSEL FOR PLAINTIFF/APPEL-LEE, STATE OF LOUISIANA, Paul D. Connick, Jr., Terry M. Boudreaux, Juliet L. Clark

COUNSEL FOR DEFENDANT/AP-PELLANT, TERRY SPEAKS A/K/A, AL-LEN RICE A/K/A LESLIE ALLEN RICE, A/K/A LESLIE RICE Bruce G. Whittaker

DEFENDANT/APPELLANT, Terry Speaks, In Proper Person

Panel composed of Marc E. Johnson, Robert M. Murphy, and Hans J. Liljeberg

JOHNSON, J.

Defendant/Appellant, Terry Speaks, appeals his convictions and sentences from the 24th Judicial District Court, Division "J". For the following reasons, we affirm Defendant's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

On August 14, 2014, a Jefferson Parish Grand Jury indicted Defendant, Terry Speaks a/k/a Allen Rice a/k/a Leslie Allen Rice a/k/a Leslie Rice, with the second degree murder of Jaren Lockhart, in violation of La. R.S. 14:30.1 (count one); obstruction of justice by tampering with evidence of a crime, to wit: the body of Jaren Lockhart and/or the personal effects of Jaren Lockhart, in violation of La. R.S. 14:130.1 (count two); and conspiracy to obstruct justice by tampering with evidence of a crime, to wit: the body of Jaren Lockhart and/or the personal effects of Jaren Lockhart, in violation of La. R.S. 14:26 and La. R.S. 14:130.1 (count three).[1] Defendant was arraigned on October 20, 2014, and pleaded not guilty.

On January 12, 2015, Defendant's motions to suppress statement and evidence were denied after a hearing.[2] His motion to quash the indictment was denied on May 27, 2015. On June 15, 2015, Defendant's motion to dismiss counsel was denied, and his motion to represent himself was granted. Additionally, the trial judge appointed two attorneys from the Public Defenders' Office as standby counsel. The next day, Defendant informed the trial judge that he wanted to exercise his right to counsel, and the trial judge reappointed standby

counsel as counsel of record. On June 15–19, 2015, the case was tried before a 12–person jury. The following evidence was adduced at trial.

On June 6, 2012, at approximately 1:00 a.m., Defendant and his girlfriend, Margaret Sanchez, went to Stiletto's, a "gentleman's club" on Bourbon Street, and asked Lacy Dillmann, a dancer at Stiletto's, if she would go to a bachelor party to dance for one of Defendant's close friends or a friend of the family. Ms. Dillmann knew Defendant because he was the doorman at Stiletto's, and she knew Sanchez because she used to dance with her at Show Bar years before. They told her that the bachelor party was at Motel 8 in Metairie. Defendant explained to Ms. Dillmann that she would receive $500.00, and that he would get $200.00 for setting up the transaction. Ms. Dillmann told Defendant that she could not leave. She testified that she had no intention of leaving with them but that for approximately 40 minutes they kept asking her to go. At some point, Sanchez told her that it was "okay" for her to leave with them and that they needed somebody "to go home with." Ms. Dillmann continued to decline their offer, so Defendant went over and talked to another dancer and attempted to get that dancer to leave with them.

Jamie Sparks, a dancer at Stiletto's, testified that Sanchez asked her if they had any girls who would go home with Sanchez for her boyfriend's birthday and that she wanted to give him a "threesome" for $700.00. Ms. Sparks responded that this was not a "whore house" and to go next door to Temptations, which was another "gentleman's club." Defendant was standing near them during this conversation.

---

1. On August 14, 2014, co-defendant, Margaret A. Sanchez, was also indicted with those same crimes.

2. On that same date, the State severed the two defendants for trial.

Nicole Lowe, a dancer at Temptations, testified that a man and a woman approached her. The female asked her if she wanted to do a "private party" for $500.00, and she responded negatively. The female then asked her whether she knew anybody else who would leave that night, and Ms. Lowe told the female that she could ask the girl who was dancing on stage at the time, Jaren Lockhart. Ms. Lowe observed the male and the female walk over to the stage and speak to Ms. Lockhart. After Ms. Lockhart finished dancing, she went to the locker room, changed her clothes, and came out. Before Ms. Lockhart left, Ms. Lowe asked her if she was leaving with the couple, and Ms. Lockhart responded affirmatively.

Before leaving, Darlene Larroque, a waitress at Temptations, also spoke to Ms. Lockhart and asked her if she was leaving. Ms. Lockhart said that she was leaving to go do "this party" because she had only made $75.00 and needed to pay rent. Ms. Lockhart additionally told Jennifer Swygert, an employee at Temptations, that she was leaving with the couple and that she needed money for her hotel room and to acquire drugs. Afterward, several individuals saw Ms. Lockhart leave Temptations with Defendant and Sanchez, including Ms. Swygert, Ms. Dillmann, Ms. Larroque, Ms. Sparks, Ms. Lowe, Maya Suarez (a dancer at the time at Temptations) and Michael Welch (the doorman at the time at Temptations). Ms. Swygert indicated that Ms. Lockhart left at approximately 2:04 a.m.

On June 6, 2012, between 5:00 and 5:30 a.m., Jeremy Foster, Ms. Lockhart's live-in boyfriend and the father of her three-year-old daughter, woke up and realized Ms. Lockhart was not home. He thought that was unusual since she typically came home on a week night between 3:00 a.m. and 6:00 a.m. He testified that he and Ms. Lockhart were daily heroin users and both had drug problems. At the time, they were living at a motel off of Tulane Avenue in New Orleans. Mr. Foster went to a pay phone on Tulane and Broad because he did not have a phone and tried calling Ms. Lockhart on her cell phone, but it went straight to voicemail. He then called a few friends from that pay phone, but they told him not to worry and that she would probably be home soon. Mr. Foster went back to the hotel and back to sleep. He awakened about 9:00 a.m., but Ms. Lockhart was still not home. Mr. Foster called his father and his aunt, a New Orleans police officer, but she told him there was nothing they could do until the following day. He tried calling Ms. Lockhart many times from the pay phone and his father's phone, and he also called individuals who worked with her.[3] On the morning of June 7, 2012, Mr. Foster reported Ms. Lockhart missing.

Beginning on June 7, 2012, partial human remains began washing onto the beach in Hancock County, Mississippi. Steve Saucier, an investigator with the Hancock County Sheriff's Office, testified that he was called out on June 7, 2012, at 5:47 p.m., because a torso had been found on the sand in Bay St. Louis at the intersection of Bay Oaks Drive and Beach Boulevard. He testified that it appeared to be a white female in her late teens or early 20's and that there were patches of skin missing in several places which they believed to be tattoos that had been cut away from the torso. The Hancock County Sheriff's Office tried to identify the individual

---

**3.** Detective David Stromeyer testified that eight calls were placed from the pay phone at Tulane and Broad to Ms. Lockhart's cell phone from 5:11 a.m. to 6:55 a.m. on June 6, 2012. He also testified that seven calls were placed from Mr. Foster's father's phone to Ms. Lockhart's phone from 11:47 p.m. on June 6, 2012, to 2:21 p.m. on June 7, 2012.

after the torso was found. Mr. Saucier began reviewing missing person reports in the surrounding areas and located a missing white female, Ms. Lockhart, who matched the age range of the torso. He searched social media and located pictures of Ms. Lockhart. They noted that Ms. Lockhart had several tattoos in the same locations as the missing patches of skin on the torso. Also, Mr. Saucier asserted that Ms. Lockhart had "tattoo sleeves" on both forearms in the photographs, which explained why the forearms may have been cut off and which led him to believe that the recovered torso was Ms. Lockhart's.

On June 9, 2012, other body parts were found in different locations: a thigh, two calves, and a head. Mr. Saucier testified that those body parts were found along the beach in Pass Christian and Long Beach, Mississippi, in Hancock County. The forearms and hands were not found, and one thigh was missing. They were not able to determine whether the body was put into the water one piece at a time or together. On that same date, they also located articles of clothing on the beach: a pair of bikini style bottoms with gold tassels, a black bustier, and a |₅black strapless brassiere.

Brandon Normand, an investigator with the Hancock County Sheriff's Office, testified that he obtained a buccal swab from Ms. Lockhart's daughter to assist in determining whether the human remains found in Mississippi were those of Ms. Lockhart. After observing the DNA profiles of the deceased victim and Ms. Lockhart's daughter, Glenn Fahrig, an expert DNA analyst, testified that the data indicated that the deceased victim was Ms. Lockhart.

Jim Faulk testified that he was the coroner for Hancock County, Mississippi, and that he utilized the services of board certified pathologist, Dr. Paul McGarry, to conduct autopsies for him from January 1, 2012, until his death, which was four or five months prior to trial. Mr. Faulk further testified that Dr. McGarry performed the autopsy on Ms. Lockhart.[4] Dr. Dana Troxclair, an expert in forensic pathology, testified that she was asked to review Dr. McGarry's report and photographs and testify regarding her conclusions as to Ms. Lockhart's death. According to the autopsy report, the autopsy was performed on June 8 and 15, 2012. She stated that only portions of Ms. Lockhart's body were presented at the time of the autopsy.

Dr. Troxclair testified that the cause of death was a stab wound to the chest, and the manner of death was homicide. She stated that the toxicology exam indicated that there were drugs in Ms. Lockhart's system; however, drugs were not the cause of her death. Dr. Troxclair noted that the weapon used was a single-edged blade knife and that the blade of the knife was, at a maximum, four and one half inches long. She explained that it entered the chest through the skin and sternum, perforated the pericardial sac where the heart sat, came out the posterior aspect of the heart, and went through the soft tissue around the esophagus. Dr. Troxclair testified that there was bruising on the head, the face, around the neck,|₆behind the ear, on the left arm, on the left and right aspect of her trunk, and on the lower portions of the lower extremities. She explained that it was not possible for skin to bruise after an individual has died.

Dr. Troxclair asserted that the injuries were consistent with someone restraining Ms. Lockhart prior to her death, more so on the neck. She stated that the injuries were indicative that more than one person may have been involved in restraining and

4. Ms. Lockhart was 22 years old when she died.

attacking her and that they were also indicative of someone who was struggling for her life. Dr. Troxclair further asserted that there was indication of blunt force trauma to the head behind the ear, meaning Ms. Lockhart was hit with a broad-shaped object like a fist, a book, a hammer, or a bat. She explained that tattoos were cut off Ms. Lockhart and that the positioning of the tattoos on her body in photographs taken while she was alive was consistent with areas where the skin was cut away.

Dr. Troxclair testified that Ms. Lockhart was dismembered, as her head, arms, and legs were removed, and she was also disarticulated, as some of the joints were cut through. The autopsy report indicated that her head and upper neck, forearms, and lower extremities were amputated postmortem. Dr. Troxclair stated that at least two different types of instruments were used to dismember and disarticulate the body—a sharp knife and a saw or other object used to cut through the bones of the neck. Dr. Troxclair explained that at the time the body was disarticulated, there would have been blood but not in large quantities because Ms. Lockhart had already died from the stab wound, so the heart was not pumping blood throughout the body.

Mr. Normand testified that his agency established that Ms. Lockhart's last known whereabouts started off at Temptations and then followed a path from Bourbon Street, where Temptations was located, down to Bienville Street, then Bienville Street up to Dauphine Street, and then from Dauphine Street down to Iberville Street. They obtained security camera video footage from three different locations in the French Quarter—Temptations, Cutie Pie on the corner of Dauphine and Bienville, and Deanie's. Mr. Normand stated

that in the Deanie's video, they saw Ms. Lockhart walking and then turning a corner onto Iberville, and then there was no more video of her.

Mr. Normand also identified video taken in the Temptations locker room. He noted that Ms. Lockhart entered the locker room for the last time at 2:00 a.m. to change her clothes. Mr. Normand testified that the video showed that she was wearing two pairs of underwear, one of which had tassels on them. He stated that it was those underwear that later washed ashore on the beach in Mississippi. He stated that the video also showed Ms. Lockhart removing from her feet laced-up style boots and that she was wearing a strapless bra prior to changing. Mr. Normand testified that in the video, Ms. Lockhart changed into leggings and a gray top and put the tassel underwear and her boots into her bag.[5] He explained that the clothes she was wearing when she left assisted them in identifying her in the videos obtained from the French Quarter establishments. He asserted that Defendant was wearing shorts, a "wife-beater" shirt, and a hat in the video leaving Temptations.

Mr. Normand testified that the video showed Sanchez leaving Temptations at 2:03 a.m. to return to Stiletto's, then Defendant and Ms. Lockhart walking out at 2:04 a.m. He indicated that at 2:05:12 a.m., Ms. Lockhart returned to speak to two ladies in the doorway and that at 2:05:47 a.m., Ms. Lockhart returned to stand next to Defendant. At 2:07 a.m., Sanchez came out of Stiletto's, and at 2:08 a.m., Sanchez, Defendant, and Ms. Lockhart walked down the street in the direction of Canal Street, according to Mr. Normand. Mr. Normand noted that the time stamp on the Cutie Pie

---

**5.** Mr. Saucier testified that he saw in the video that Ms. Lockhart put the bustier, the

bra, the boots, and the tassel underwear into her bag.

video was 2:20 a.m., and the time stamp on the Deanie's video was 2:21:40 a.m.

Mr. Saucier testified that after Mr. Normand retrieved the videos from Temptations, they put on television news stations on the afternoon of June 12, 2012, that segment of the video showing Ms. Lockhart leaving with a male and a female. They subsequently received a call from Sanchez's brother. After that call, they took steps to make contact with Sanchez and Defendant, her boyfriend. Search warrants were obtained for their residence at 2029 Connecticut Avenue, their Chevrolet Lumina, and their cell phones and computers. On June 12 and 13, 2012, their residence, both inside and outside, was searched, and objects were collected as evidence.

Mr. Saucier testified that when he entered the residence and went to the bathroom connected to the master bedroom, he smelled bleach and chlorine, which he did not smell in the other rooms in the house. Mr. Saucier testified that many items were shipped to the FBI lab; however, none of them came back linking Ms. Lockhart to that house. He explained that a cadaver dog, which alerts to human remains, alerted near the back fence, shrubbery along the fence line, an area near a burn pile, and a trash can. He further testified that even though no scientific testing connected Ms. Lockhart to the house or the car, he did not develop any information suggesting that anyone other than Sanchez or Defendant was responsible for Ms. Lockhart's death.

Mr. Saucier asserted that during the investigation, e-mail correspondence between Defendant and Sanchez mentioned the terms "Venus Transit" or "Venus Transition." After researching those terms, he learned that it was a rare astronomical phenomenon that only occurred twice every 2000 years, and that it had occurred on June 5 and 6, 2012. He considered this to be a possible motive for the homicide; however, he was uncertain of the actual motive.

David Stromeyer, a detective with the Kenner Police Department in June of 2012,[6] testified that he eventually became the lead detective in the case. Detective Stromeyer also testified that during the investigation, they found in the burn pile in the backyard of the Connecticut residence small burned items of what appeared to be little leather straps with a buckle on them, a burned cell phone battery, and a rusted zip tie. They additionally found a pair of women's panties and a hand towel buried underneath the burned items. Mr. Saucier testified that the straps with the buckle resembled the straps on the shoes that Ms. Lockhart wore out of the locker room when she left Temptations. Although the items were sent to the lab, the results of testing were negative.

Detective Stromeyer testified that Defendant and Sanchez were driving a 2001 green Chevrolet Lumina with license plate number LKY502, and that they lived less than a mile from the airport.

Jeff Adams, a detective with the Kenner Police Department in June of 2012, testified that Detective Stromeyer asked him to determine if that license plate had been read by any license plate recognition cameras at certain times. Detective Adams testified that a picture was taken of that license plate on June 6, 2012, at 2:43 a.m. at Loyola and Veterans in Kenner[7] and on

---

6. Although he was no longer employed by the Kenner Police Department at the time of trial, he is referred to as "Detective" throughout this opinion.

7. Detective Stromeyer testified that the Loyola exit was one of two exits off the interstate that would offer an easy and convenient route to the house on Connecticut.

June 6, 2012, at 8:43 p.m. at Williams and Vintage near Winn–Dixie in Kenner. Mr. Saucier and Detective Adams indicated that a picture was taken of that license plate on June 6, 2012, at 9:34 p.m. on I–10 eastbound in the center lane in Slidell heading toward Mississippi. Detective Adams testified that a picture was taken of that license plate on June 6, 2012 at 11:51 p.m. on I–10 westbound in the right lane in Slidell coming from Mississippi. Mr. Saucier was aware that Latisha Morris[8] put Defendant and Sanchez in that car approximately fifty minutes before the license plate reader on I–10 heading eastbound took a picture of the license plate on that car. Mr. Saucier explained that from New Orleans to the location where the torso was found would take approximately an hour and a half to two hours depending on the weather and the traffic.

Lieutenant Kim Moore of the Tangipahoa Parish Sheriff's Office testified that in June of 2012, she was asked to assist in locating Defendant and Sanchez. She located them in a vehicle traveling on Highway 443. Sanchez was driving, and Defendant was a passenger. When Sanchez failed to use her turn signal, Lieutenant Moore initiated a traffic stop. She ordered the driver out and asked for her driver's license and other documents. Defendant subsequently exited the vehicle. Lieutenant Moore asked him for his identification, but he could not provide any. Defendant gave her two names, Allen Rice and Leslie Allen Rice, a date of birth, and two social security numbers. Afterward, he ran away. Lieutenant Moore's sergeant ran after Defendant, and U.S. Marshalls arrived and pursued him as well. As Defendant was fleeing in a field, he turned around, faced

the marshals, and began yelling that he had a gun, and he told them to shoot him. Lieutenant Moore testified that they did not shoot Defendant, and that Defendant did not have a gun. She believed she witnessed an attempted "suicide by cop" that day. Defendant and Sanchez were arrested on June 12, 2012. Defendant remained in custody, but Sanchez was released approximately two months later.[9]

Kevin Miller, an FBI agent, testified that he was part of the evidence response team that was involved in efforts to collect evidence from the Chevrolet Lumina. They took photographs, collected DNA samples, sprayed chemicals in an attempt to detect blood and bodily fluids, dusted for fingerprints, and vacuumed for trace evidence; however, nothing was found that established that Ms. Lockhart had been present in that vehicle.[10] He explained that Luminol spray indicated in certain areas of the vehicle the possible presence of blood; however, the lab could not confirm that blood was present. He further explained that Luminol also alerted to the presence of cleaning substances and solutions. Agent Miller testified that the vehicle was very clean. Glenn Fahrig, an expert DNA analyst, testified that he examined items from Defendant's residence and a knife from a storage unit; however, he was not able to develop any evidence establishing that those items had been handled by or been in physical contact with Ms. Lockhart. He also explained that the process of wiping a surface and the use of certain cleaning agents could diminish the ability to recover DNA.

Patrick Lane, an expert in the field of crime scene investigation and reconstruc-

---

**8.** Ms. Morris was Sanchez's co-worker.

**9.** Detective Stromeyer later testified that Sanchez was arrested and taken into custody again on May 7, 2014.

**10.** Mr. Saucier also testified that they did not find any evidence connecting Ms. Lockhart to the car.

tion, testified that it was not surprising that no physical evidence was recovered from the house or the vehicle. Mr. Lane opined that blood could have been eliminated by washing the area with Clorox or by using fire and that could have been done in the controlled setting of the residence in an unlimited time frame. He explained that if the knife was left in the chest, that source of blood was eliminated because it was contained. He also explained that the dismembering would have best been done in the bathtub because it was self-contained and everything could have been washed down the drain. Mr. Lane asserted that garbage bags would have been best for transporting the dismembered body.

Scott Downie, an expert in the field of computer forensics, testified that he was asked to examine Defendant's cell phone and computer. He further testified that on June 7, 2012, a downloaded program was run that was designed to clear internet history and registry information from Defendant's computer. He explained that there was no internet activity between June 5, 2012, at 8:37 p.m. and June 6, 2012, at 10:41 a.m. Mr. Downie also testified that eleven photographs taken on May 3, 2012, near the beach in Pass Christian/Bay St. Louis, Mississippi, were deleted from the cell phone on June 10, 2012. Detective Stromeyer testified that Defendant appeared in one of these photographs, and

that Defendant and Sanchez appeared in another one. Detective Stromeyer explained that these photographs showed Defendant and Sanchez were familiar with that area, an area where they could conveniently dispose of a body.[11]

Detective Stromeyer testified that Ms. Lockhart's phone records were obtained. His review of those records showed that Ms. Lockhart did not use her phone after leaving the club and that her phone was off. Detective Stromeyer stated that the records reflected that the last outgoing phone call was at 12:55 a.m. on June 6, 2012, and the last text message she sent was at 1:53 a.m. on June 6, 2012.[12] Mr. Saucier testified that her phone was never recovered.[13]

Several witnesses were interviewed during the investigation. Michael Welch, the doorman at Temptations in June of 2012, testified that he was working the last night that Ms. Lockhart worked at Temptations. He explained that he knew Defendant because he and Defendant worked for the same company at one time and because Defendant rented a house from him for a few days. Mr. Welch asserted that he observed Ms. Lockhart leave with Defendant and Sanchez. He testified that the next morning, he got a phone call from another manager who said that Ms. Lockhart's boyfriend was concerned because Ms.

---

**11.** Mr. Saucier testified that he learned that on May 3, 2012, digital photographs were taken by Sanchez and Defendant on the beach "between the bridge at Bay St. Louis and the beach between the area where Jaren's torso was found and Jaren's head was found."

**12.** Joseph Trawicki, a records custodian for Sprint, testified that he produced phone records which showed the last outbound traffic from Ms. Lockhart's phone was a text message on June 6, 2012, at 1:53:44 a.m., and the last outbound phone call was on June 6, 2012, at 12:55:16 a.m.

**13.** Detective Stromeyer testified that there were many ingoing and outgoing text messages between Aaron Sharkey and Ms. Lockhart prior to her leaving the club and text messages from Mr. Sharkey to Ms. Lockhart that went on for hours after she left the club. He explained that Mr. Sharkey was a regular customer of Ms. Lockhart's and that the text messages included statements by Ms. Lockhart consistent with her expressions to other people that she was desperate to make money that night.

Lockhart never arrived home. Mr. Welch called Defendant to see where Ms. Lockhart was.[14] He asked Defendant what was going on as Defendant was the last one who saw her. Mr. Welch stated that Defendant's reaction was very surprising as Defendant "just went off on him." Defendant was irate and hollering and told Mr. Welch that he [13]was not with her, he did not know where she was, and that he "didn't do nothing." Afterward, Defendant told Mr. Welch irately not to call him back and hung up.

Ashley Cessec testified that in June of 2012, she and Sanchez worked together bartending at Treasure Isle Tavern. She further testified that on June 6, 2012, at 10:40 a.m., Sanchez came to work with Defendant for her 11:00 a.m. shift, and they had a dog with them. Ms. Cessec explained that Sanchez looked like she had been sick all night; she was pale in the face, and her hair was messier than usual. Ms. Cessec asked Sanchez what was wrong, and Sanchez responded that she was sick. Ms. Cessec also noticed that Defendant had flip flops on, and his feet were dirty like he was "just walking through dirt or something." Defendant used his laptop computer for a few minutes, but she asked Defendant to leave because he could not have a dog in the bar. Ms. Cessec asked Sanchez if Sanchez could work her shift, and Sanchez responded affirmatively. Sanchez stayed and worked her shift, and Ms. Cessec left.

LeeAnn Anderson testified that she knew Defendant and Sanchez. She explained that the night before Defendant and Sanchez were arrested, they stayed at her house because they told her they were being forced to leave the house on Connecticut. On the day before they were arrested, Ms. Anderson went with Sanchez in Sanchez's father's Chevrolet Lumina to the house on Connecticut to pick up a few belongings. Ms. Anderson testified that on every prior occasion she had been in that vehicle it was "very, very filthy." However, she asserted that the day before they were arrested, that vehicle was very clean, had been detailed, and smelled like Ajax or bleach, "like a hotel bathroom sort of smell." Ms. Anderson went into the house on Connecticut. She said that on every prior visit the house was not clean; it was very messy with things thrown about. However, she said that on the day before they were arrested, the house smelled like cleaning products and appeared clean. Ms. Anderson asserted that the belongings were placed into the [14]trunk of the vehicle and that the trunk was very clean.

Ms. Anderson testified that in the days leading up to the arrest, Defendant and Sanchez were at her house when there was a really hard "cop knock" at the door. Ms. Anderson opened the door and saw her neighbor who worked at a security company wearing his uniform that resembled a police uniform. When Defendant saw the man, Defendant said he was going to get a Snickers bar, ran out the back door, and jumped over a fence. Defendant returned an hour or two later.

Latisha Morris testified that in June of 2012, she was working at My Bar and that she knew Defendant as "Allen," whom she identified in court. She also knew Sanchez, whom she met through Defendant, as Defendant's girlfriend. Ms. Morris testified that on the night of June 5, 2012, she was

---

14. Mr. Welch testified that his phone number was 504–223–0268 and that it had been so for four or five years. He further testified that 2:03 p.m. was consistent with the time of day he remembered calling Defendant. Susan Johnson, a senior specialist for T–Mobile, testified as custodian of records, that on June 7, 2012, at 2:03 p.m., cell phone number 261–1837 received an incoming phone call from 504–223–0268.

at Stiletto's when Defendant and Sanchez walked in. They told Ms. Morris they were moving and had to get rid of their dog. They asked her if she could take it. The next day, on June 6, 2012, they made arrangements for her to take possession and ownership of the dog.

Ms. Morris testified that on June 6, 2012, she met Defendant and Sanchez at the Winn–Dixie parking lot on Vintage Drive and Williams Boulevard in Kenner. Shortly thereafter, Sanchez and Defendant arrived in a green car, and Defendant was driving. When they pulled into the parking lot, Defendant got out of the car and took the dog out of the back seat. Sanchez did not get out of the car. Ms. Morris asked Sanchez what she was doing, and Sanchez responded that she was tired and had just gotten off of work. Ms. Morris got the dog, put him in her car, and they left. Ms. Morris explained that it was a quick exchange, and that she was not given anything for the dog like a dog bed or dog food. She asserted that at no point was the trunk of the green car open. Ms. Morris noticed that there was a blanket over the back seat of the green car.

Jonathan Craft testified that in June of 2012, he was living at his mother's house on Connecticut Avenue in Kenner. His place of employment was close to home, so he frequently went home for lunch. Mr. Craft testified that on June 6, 2012, he went home for lunch. When he was walking back to his truck to go back to work, he looked over and saw that Defendant had the trunk of a green Chevrolet Lumina open. The trunk was facing the street, and the hood was facing the garage. Defendant had his back to him at first. He recognized Defendant as one of his neighbors. Mr. Craft noted that Defendant was wearing a white "tango-style" hat and a tank top that would be referred to as a "wife-beater" shirt.

Mr. Craft explained that Defendant was "fumbling" with a garbage bag. Mr. Craft further explained that Defendant then turned around and looked at him with a "deer in the headlights look." Defendant subsequently pulled the bag out of the trunk and went inside of his house. Mr. Craft asserted that he could not see what was in the bag, but he knew there was something in it because of the way Defendant held it and the way he was trying to get inside with it. He noted that when Defendant carried the bag inside, he had both of his hands up around his chest. He further noted that it looked like there was sufficient weight that required both of Defendant's hands to carry what was in the bag. Mr. Craft believed that Defendant was hiding something, that the look on Defendant's face was suspicious and paranoid, and that Defendant had a guilty look "like he stole something." He testified that the bag caught his attention even before he found out about Ms. Lockhart.

Detective Stromeyer testified that Defendant was incarcerated in Orange County but was moved to the prison facility in Otisville, New York, in 2013. Mr. Saucier interviewed Defendant at the federal prison in Otisville, New York, on September 17, 2013. He stated that during that interview, Defendant did not make any admission that he or Sanchez murdered Ms. Lockhart nor did anything to her body; in fact, Defendant specifically denied involvement. Defendant stated he never left (Temptations) with Ms. Lockhart; however, Mr. Saucier explained that was inconsistent with the video and the information obtained from employees at Temptations and Stiletto's. Defendant also said that he had only been to Mississippi once in his life.

At some point, Detective Stromeyer was notified that Defendant had made admissions regarding the instant case to two

inmates, Christian Del Rosario and Trevor Lucas, at the Otisville prison. On April 30, 2014, Detective Stromeyer and other law enforcement officers met with them separately. He explained that prior to the interviews, he did not provide them with information regarding Ms. Lockhart's case. Detective Stromeyer testified that either or both of those inmates provided details that he found consistent with information developed in the investigation that had not been published in any newspaper article or on television.

Mr. Del Rosario testified that he first met Defendant during March or April of 2013 in federal prison in Otisville, New York. Mr. Del Rosario stated that he was serving a life sentence for murder. He explained that in an unrelated case, he had an issue where he was charged with bribing a witness. He and his co-defendant agreed that the co-defendant in that case would lie on the stand in exchange for $100, which the co-defendant did.

Mr. Del Rosario testified that at some point, Defendant became one of his cellmates and told him information about Ms. Lockhart's case. According to Mr. Del Rosario, they had a very good relationship, and at trial, he identified a photograph of the two of them together. Mr. Del Rosario provided that information to law enforcement in the hope of obtaining leniency in his sentence. He stated that the Louisiana Assistant District Attorney filed into the record a "Notice of Favorable Treatment for a State's Witness," and he understood that if he was truthful in his trial testimony, the State would write a letter recommending leniency. He also understood that the State would write that letter whether he testified or not. Mr. Del Rosario asserted that he did not conduct any research into the facts of this case before he went to law enforcement with the information.

Mr. Del Rosario testified that Defendant told him he and Sanchez met the victim in one of the strip clubs on Bourbon Street and that the crime took place the first week in June of 2012. Defendant told him the victim was a beautiful, gorgeous girl but that she was a hooker who used to work in one of the clubs. Defendant said that he used to be a doorman or security man for one of the clubs. Defendant expressed concern that people saw them leave with this girl and that other dancers saw them either leave the club or get into the car when they left. He told Mr. Del Rosario that he was with his wife, Margaret, when he left the club with the girl. He said that they offered the girl some drugs, and she agreed to leave with them. Defendant said that the plan was to take the girl someplace and have sex, and that he and Margaret did threesomes with other girls. Defendant stated that there was surveillance video but that video would not incriminate him because it did not catch them when they got inside the car. He explained that, at some point, he noticed the victim was dead. He further stated that after they disposed of the body, they took the car and made sure they left no traces behind. Defendant told him they cleaned the car's interior and exterior and put bleach in the trunk of the car. Defendant gave him different versions of the event at different times.

Mr. Del Rosario testified that Defendant told him that homicide detectives came from New Orleans to talk to him about the case on September 16 or 17 [15]. Defendant stated that he was worried about questions they were asking him. Mr. Del Rosario thought Defendant was trying to conceal something. Defendant told him he understood how police interrogated people, as he used to be in the Marine Corps, and knew

---

**15.** Mr. Del Rosario did not specify the year.

interrogation tricks like "the good and the bad cop." He said that he would not "fall for it." Defendant told Mr. Del Rosario that he denied everything they asked him. He stated that he called his wife, Margaret, and told her not to worry because law enforcement had nothing incriminating against them and to keep her mouth shut.

Mr. Del Rosario testified that Defendant said that the first thing they did was decapitate the body, then cut off her legs and arms. Afterward, Defendant said they put the body parts in the trunk and were going to dump the body in a river. The next time, Defendant told him they dumped the body in a very large lake near a bridge. Defendant explained to Mr. Del Rosario that they tried to dump the body as far away as possible from where the body was cut up because they believed someone saw them when they picked up the girl and came out of the club, and everybody would connect them to the crime.

Mr. Del Rosario testified that Defendant did not tell him the first or second time what they put the body in before they put it in the trunk; however, the last time, Defendant told him they put the body in plastic bags and put the plastic bags inside the trunk of the car. The first time, Defendant did not tell him if the body parts were deposited one at a time; however, Defendant later said that they discarded the body parts in different places to ensure that if somebody found one of them, that person would not be able to identify the victim. Mr. Del Rosario testified that Defendant told him the place where they dismembered the body was near an airport. The second time, Defendant told Mr. Del Rosario that they went to the store and bought some Clorox bleach and disinfectant and cleaned the scene where the body was dismembered. Defendant said they put Draino in the pipe in case some blood was stuck in there. The second time,

Defendant said that they dismembered the body in the bathtub.

Mr. Del Rosario testified that at one point, while Defendant was his cellmate, Defendant came in the cell, opened the door, slammed a book down, and cursed Margaret, saying that she was going to marry someone else. Defendant told Mr. Del Rosario that he could put her in jail for life if he wanted to. He also said that Margaret knew that he had some things that belonged to "you know, she knows." Defendant stated that if Margaret married that other man, she would regret it. Mr. Del Rosario testified that Defendant gave him several stories of how he killed the victim and that the last story was completely different than the earlier versions. Mr. Del Rosario explained that at that time, Defendant had been moved from their cell for five months, and they were no longer cellmates. He stated that it was Defendant's idea to move and that Defendant did not let him know until the day he moved. Mr. Del Rosario asserted that it was after Defendant learned that Margaret had been arrested and that Defendant's mother told him she was checking the internet and found out that Defendant had confessed to the crime. After that, Defendant was acting weird toward Mr. Del Rosario, like Defendant thought he had told the police.

Mr. Del Rosario testified that after Margaret was arrested, Defendant told him that he and Margaret waited for the girl to come out of the club, and that they asked her to come join them for a party and sex. Defendant told him the girl rejected him and Margaret, so they followed the girl, and Defendant struck her on the head. Defendant told him that he and Margaret "hog-tied" the girl, put her inside the trunk of the car, and drove to the house. Defendant stated that when they got to the house, they put the unconscious girl in

the bathroom. Defendant explained that when the girl regained consciousness, Margaret "went crazy," ran to the back yard, grabbed a "sieve" and started stabbing the girl "time and time again" until she fatally wounded the girl. Defendant told him that he was going to cut "it" with a "gas metal saw." He also told Mr. Del Rosario that he and Margaret had killed a dozen more people.

Mr. Del Rosario testified that he made notes when Defendant told him information; sometimes, he would write them on pieces of napkins or little papers because he did not want Defendant to see him writing. He explained that sometimes the notes were contemporaneous, and sometimes they were done the next day or a couple of weeks later.

During redirect examination, the State showed Mr. Del Rosario some of those notes. Mr. Del Rosario testified that he met with the investigators on April 30th, before Margaret was arrested on May 14, 2014. Therefore, Mr. Del Rosario explained that he did not have the opportunity to tell the investigators what took place after Margaret was arrested. Mr. Del Rosario testified that the last version from May of 2014 was when Defendant told him they dismembered the body in the bathroom, put the body parts in plastic bags, and put the plastic bags inside of the trunk of the car. Defendant also told him they took the body parts to Mississippi and dropped them in a river. Mr. Del Rosario testified that Defendant said that after that they went right back to the house. Defendant said that later on, he took his wife, Margaret, to her workplace, and when they got there, they pretended that everything was okay. Defendant informed him that afterward, he went back to the house and cleaned it using Ajax, Clorox, and strong chemicals, and he also cleaned the trunk of the car. Defendant told him

that if the police wanted to find the victim's internal organs, they better go check the dog and maybe they could find them inside of the dog.

Mr. Trevor Lucas testified that he was living in a federal prison in Otisville, New York, when he met Defendant. Mr. Lucas explained that he pleaded guilty to and was serving time for brandishing a firearm in relation to a crime of violence and was sentenced to 17 ½ years imprisonment. He testified that in connection with him providing information to law enforcement, the State told him they would notify the U.S. Attorney's Office, and his hope was that his sentence would be reduced.

Mr. Lucas asserted that several years before, he had a roommate named "Aldo." Mr. Lucas moved out of that cell, and Defendant moved into that cell. Afterwards, Mr. Lucas would go to that cell and talk to Aldo and Defendant. There were times that he and Defendant spent time together alone, usually Saturday and Sunday mornings watching mainly Law & Order television shows. Mr. Lucas explained that Defendant would ask him questions about Law & Order. He maintained that Defendant told him he was under investigation for murder. Defendant told Mr. Lucas that there was a girl named "Jeanne Rae" who worked at a night club called Stiletto's. Defendant said that he used to work at the club as a bouncer or something, and that he and his wife were concerned because they thought they killed that girl. Defendant told Mr. Lucas that the police told him that he was seen on camera while walking out of the club near Jeanne Rae. Defendant explained that investigators from the FBI and Mississippi came to Otisville and talked to him.

Mr. Lucas asserted that he did not research this case and did not know anything about this case other than what Defendant

told him. Defendant told Mr. Lucas that they used his wife's father's car, an SUV. Defendant stated that the police questioned him about blood on the hood of the car; however, Defendant said that was impossible because it rained that night. Mr. Lucas testified that Defendant told him he brought the vehicle to a self-cleaning car place and that Defendant said he cleaned mostly the interior.

Mr. Lucas asserted that he and Defendant spoke twice about this matter. He stated that the first time, Defendant told him he participated in the killing of the girl, Jeanne Rae. The second time, Defendant told Mr. Lucas that his wife killed her and that Defendant assisted in covering it up by cleaning the car and getting rid of the body. Defendant told him that he drove approximately three hours from his house to Mississippi, dismembered and cut up the body on the shore, and got rid of the body parts. Mr. Lucas testified that Defendant told him about items he was concerned about, namely, the police had found a sword in his storage locker. Defendant stated that if he ever dismembered a body, he would use a hatchet because that was what the Native Americans would use. Mr. Lucas asserted that Defendant told him he dumped the body parts in the gulf.

Mr. Lucas testified that Defendant said the torso was found first, and that it was found the next morning after Defendant committed the crime. Defendant told him about the day they were stopped by the police. Defendant explained that they were in his wife's car, and his wife was driving. Defendant said the police asked him for his social security number, driver's license, and registration, and that Defendant ran after providing his name and social security number. Defendant stated that approximately five police officers were chasing him.

Mr. Lucas testified that Defendant told him two stories about disposing of the body parts. The first time, Defendant told Mr. Lucas that he dropped his wife off at his house, and from there, he drove three hours to Mississippi to get rid of the body. Defendant then drove back three hours and dropped his wife off at work at approximately 10:30 a.m. Approximately one month later, Defendant told Mr. Lucas that he left the body in the car, and that he and his wife just went in the house like nothing had happened. Defendant said that the next morning, after Defendant dropped his wife off at work at approximately 10:30 a.m., he drove three hours to get rid of the body during the daytime later in the day.

Mr. Lucas testified that he was concerned about a neighbor of his named Jason. Defendant explained that he was in the driveway next to his car, and Jason was on his stoop or balcony and saw him. Defendant was concerned that if Jason saw him at the wrong time, it would "mess up" his alibi. Mr. Lucas recalled a time in August of 2013 when Defendant was upset with Margaret. Defendant had a phone call with his wife and learned that his wife moved out of Louisiana and wanted to stop seeing him and be with someone else. After that phone call, Defendant hung up and said, "that b*tch, I could have given her life. How can she leave me like this?" Defendant also expressed concern about evidence found in a burn pit in his backyard. Defendant told Mr. Lucas that the police found a bra in his backyard. Mr. Lucas testified that Defendant told him he cut the body up to "mess with identification, so they'd think it was a psycho or something instead." Mr. Lucas's conversations with Defendant were not recorded, and there were no witnesses to the conversations.

Detective Stromeyer testified that numerous phone calls and e-mails were exchanged between Defendant and Sanchez while Defendant was incarcerated, some of which he explained were relevant to the instant case. He testified regarding excerpts from those phone calls and e-mails. He stated that the first time Defendant and Sanchez could communicate after being arrested on June 12, 2012, was on August 26, 2012. On August 26, 2012, Defendant told Sanchez on the phone, "I need you to stay strong...We still got that Mississippi sh*t over our heads... I need you to keep in codes..." Detective Stromeyer explained that throughout their calls, Sanchez kept speaking in codes, but Defendant did not do so when they were not getting along.

Detective Stromeyer asserted that on September 3, 2012, there were calls between Defendant and Sanchez regarding Parvo, a potentially fatal disease puppies can get similar to the flu, and their dog, Logan. He explained that it did not appear that the real subject was either Parvo or Logan.

On September 3, 2012, the following exchange occurred on the phone:

DEFENDANT: Yes, people that experienced what we experience don't walk away from each other...Uh, Mine and my first marriages never experienced what me and you experienced

SANCHEZ: We experienced a lot of things, yes. We went through some hard f*cking times with parvo and what not...

DEFENDANT: You know what, I was hoping that last thing that you and I done together proved that I trusted you and you trusted me and we

were never going to separate from each other...

SANCHEZ: The hardest thing, going through parvo, dealing with that parvo, okay...That was, that was so fricking, just, just it was, it was, it was, it was insane, and it was tough, and, you know like it was something very

DEFENDANT: The parvo, right? The thing, I'm thinking on the same level as you are. The parvo with the dog, right?

SANCHEZ: It was the most intense thing that two people can go through...Okay, that was a very intense experience and

DEFENDANT: and you don't want to walk away from that...it will live with, it will stay with, us forever.[16]

Detective Stromeyer testified that Defendant communicated with his ex-wife, Cindy Shaw, on July 12, 2013. He explained that prior to that call, no law enforcement officer had ever stated publicly that only Sanchez was suspected of killing Ms. Lockhart and that Defendant was only a suspect in cleaning up the mess. On July 12, 2013, when Ms. Shaw asked why the instant case was on the news, Defendant responded, "The girl that I was involved with. They were accusing her of murder and saying that I was part of it that I cleaned up the mess or something, I don't know."

In a December 7, 2013 phone call, the following exchange occurred:

SANCHEZ: I'm sure gonna f*cking try to have a nice life

DEFENDANT: Okay, well I'm gonna tell you right now it ain't gonna f*cking work.

SANCHEZ: It ain't for you to decide

---

**16.** Defendant later testified that they talked on the phone in codes and that "Parvo" referred to them being persons of interest in Ms. Lockhart's murder.

DEFENDANT: I know you. I know you. It will be for me to decide. It is for me to decide. That's what you seem to be forgetting. Either you can decide it or I can decide it, but and I have

SANCHEZ: You have no power over me

DEFENDANT: Oh really

SANCHEZ: You have no power over me

DEFENDANT: I have power over me

SANCHEZ: Over me

DEFENDANT: I have power over me, you understand, I have power over me. I have power over me and what happens to me unfortunately happens to you that's the sad part of this whole story. What happens to you, happens to me and what happens to me, happens to you but I don't see that you f*ck, I don't see that you see that, I think you think that we're two individuals splitting paths here and going on different lives, different separate ways

SANCHEZ: Sh*t. I am attempting to have happiness. I am attempting to have a good life.

DEFENDANT: The only reason that I

SANCHEZ: And you know what?

DEFENDANT: The only reason I have been protecting you this whole f*cking year and a half

SANCHEZ: No, no, no, no, no, no, no, no, no

DEFENDANT: the only reason I been protecting you from this whole year and a half is cause I thought we going to be together

SANCHEZ: No, no f*cking way, no f*cking way. No, shut your fricking mouth

DEFENDANT: Don't tell me to shut the f*ck up, Read the emails.

****

DEFENDANT: You know what? I'm going to talk to the people on Monday and ain't nobody going to have a life, that that's

Detective Stromeyer also testified regarding e-mails Defendant and Sanchez exchanged while Defendant was imprisoned. On June 19, 2013, Sanchez indicated to Defendant that she knew their e-mails were being read. Detective Stromeyer testified that e-mails from July 1, 2013 were the first e-mail communications where there was a reference he deemed relevant to the investigation. On July 1, 2013, Defendant told Sanchez in an e-mail, "we both are really in the same boat you could be where I am and could still be…who nows [sic] the fiture [sic]… I prey [sic] you never end up here…."

On July 5, 2013, Defendant told Sanchez in an e-mail, "I'm the only reason you are still out there… Where is the gratitude for me. You are the one who should be thanking me for protecting you."

Later, on July 5, 2013, Defendant told Sanchez in an e-mail,

I wanta [sic] tell everything to the people just so you can suffer like me…I did everything to clean up the mess we made and where is the thanks…trust me I'm about to just blank…I deserve asome [sic] respect from you…you're the one the"ll [sic] fry not me…acting crazy and blaming drugs want [sic] free you…remember when you went to work…and I had to spring clean…well I saved some things just in case I needed them…in case you went off course well you're off course…I'm not stupid by any means Margaret and I think you know that or you know you would be in prison. You think I won't say something…you need to respond and fix your f*ck up…or not…if not then enjoy the next ten months of freedom…I

hold the cards..try me...rmember [sic] the boots??? remember the panties with both your juices in them??...do you remember what you were wearing?? shall I go on...

On November 9, 2013, Sanchez told Defendant in an e-mail, "I went to the lake by the casino[,] where we watched venus transition over the ·moon." Defendant asked her how she felt about the moment, and Sanchez replied, "what moment." Defendant asked her why she went, what memory did she have, and how did she feel, after which he stated, "what's wrong with you?"

On December 7, 2013, Defendant told Sanchez in an e-mail,

be honest with your dad and mom and johnny..let them know what our relationship was and is about...you are going to let other people tell you what you need to do...then I'll tell you what I plan to do...I plan on setting the record straight. and then lets see how life turns out...you have till Monday...to convince me you are not going to make the mistake of marrying someone else...

Approximately twenty minutes later, Defendant told Sanchez in an e-mail, "im talking to the people Monday...im ready to go..i dont care anymore...my life is over anyway..." Detective Stromeyer testified that Defendant never talked to the "people" or the police on that Monday.

After the State rested, Joe Sanchez, Margaret Sanchez's father, testified that Margaret was living in his mother's house at 2029 Connecticut Avenue in Kenner and driving his 2001 green Chevrolet Lumina. Mr. Sanchez testified that Margaret had trouble paying her bills so she brought in a boarder, Defendant, whom he knew as "Allen Rice." He testified that he was sup-

posed to get the Lumina back on June 12, 2012, and that he was going to give Margaret a Geo Prism he had bought for her. Mr. Sanchez explained that periodically he would use the Lumina and that he would admonish Margaret because the car was "always a mess." He asserted that he asked them to have the car clean when they returned it. Mr. Sanchez testified that in June of 2012, he did not own or drive or have access to an SUV. He maintained that he did not use the Lumina around June 12, 2012, but he had some personal belongings inside of it. Mr. Sanchez testified that he did not clean that car for them, and that he could not have because it had been impounded.

Mr. Sanchez noted that before June 6, 2012, he received notice that the house on Connecticut would be foreclosed upon. Mr. Sanchez testified that his sister moved into that house and was living there in June of 2012, but she was not spending every night there. Mr. Sanchez admitted he told the police that his sister moved in but never stayed there overnight. He stated that in June of 2012, Margaret and Defendant had to move out of the house because they were not getting along with his sister. He informed them they had to clean up the house and leave. When he visited Margaret and Defendant, he told them they had a week to get rid of their dog, so they got rid of it. He explained that he was often asked to help out financially, and he was not under the impression that either of them had any money or that Defendant could have come up with $500.00 or $700.00.

Defendant testified that he completed high school, that he could read and write English, and that he understood the proceedings.[17] He further testified that, on

17. Defendant further testified that he had criminal convictions. He was convicted in 1993 of felony larceny and received a five-

year suspended sentence with five years probation; in 1995 of assault on a female and served a sixty-day sentence; in 2000 of viola-

June 6, 2012, the date of the crime in the instant case, he was living at 2029 Connecticut in Kenner. Defendant asserted that on June 5, 2012, he and Sanchez went to the French Quarter to find Ms. Morris to see if she would take their dog. They parked on Rampart and walked to Bourbon Street and down to My Bar to see if Ms. Morris was there, but she was not. Afterward, they went to Stiletto's because he knew Ms. Morris would be there since her ex-husband worked there. Defendant explained that on the way, Nick, a man he met during Mardi Gras who liked to plan parties, asked if he knew of a couple of dancers he could get for him to have a party. Defendant told the man he would see what he could do. Defendant testified that Sanchez immediately volunteered to be one of the dancers. He claimed that the man was going to give $200.00 to Defendant and $500.00 for the other girl. Afterward, Defendant proceeded to find another girl. Defendant and Sanchez approached a woman named "Mariah" who was standing outside of Stiletto's and asked her to go, but she did not. Defendant and Sanchez then met Ms. Morris in Stiletto's and made arrangements to give her the dog.

Defendant testified that he and Sanchez subsequently went next door to Temptations to try to find another girl, at Sanchez's insistence. Sanchez approached the girl at the bar, and the girl pointed to the stage. Sanchez walked over and talked to the girl onstage, Ms. Lockhart, whom he did not know. Sanchez came over and told

him not to go anywhere because she had to find something. Ms. Lockhart approached him and asked where his wife was. Defendant told her Sanchez was finding something for her next door. Ms. Lockhart told Defendant not to go anywhere. A few minutes later, Ms. Lockhart came and asked him if his wife was back yet. Defendant responded negatively and said they would go next door because Sanchez was getting something for Ms. Lockhart. Ms. Lockhart left and then came back dressed differently to leave.

Defendant testified that he and Ms. Lockhart walked out of Temptations and over to Stiletto's. Defendant was about to go into Stiletto's but Sanchez told him to wait. Sanchez came back outside and said she could not find anything. The three of them discussed the party, and Ms. Lockhart agreed to be one of the girls. Defendant told Ms. Lockhart that she would get $500 and that he and Sanchez would get $200. Defendant, Sanchez, and Ms. Lockhart proceeded to meet the man in between Iberville and Burgundy or Rampart. Defendant identified the three of them walking on the videos.

Defendant explained that as they were walking down Iberville, but before they got to Burgundy, they saw the man. The man threw up his hands and said he had bad news, and that "they" only wanted one girl. They decided that Ms. Lockhart would be the girl because they had gotten her to leave her work. The man gave De-

---

tion of a protective order and received a sentence of one year suspended and one year probation; in 2003 of indecent liberties, a sex offense, and received a sentence of twenty-four months on two counts suspended and three years probation; and in 2003 of possession of stolen goods and received a twenty-four month sentence suspended and three years probation, concurrent with the sex offense sentence. In 2005, Defendant violated probation and served forty months; in 2009,

he had a sex offense violation and received a suspended sentence and three years probation; in 2012, he was convicted of another sex offense, a federal violation, and sentenced to thirty-three months active in the Otisville federal correctional facility. In 2014, he pleaded guilty to failure to register as a sex offender in Jefferson Parish and received an eight-year sentence. He also had misdemeanor convictions from 1993 to "2000 something."

fendant $100 because only Ms. Lockhart was going. Sanchez pulled Ms. Lockhart aside, and Ms. Lockhart took her boots from her bag and handed them to Sanchez. Sanchez told Defendant she had a surprise for Defendant when they got home. Defendant testified that afterward, he and Sanchez left. They went down Rampart to where they parked, got into their Lumina, and went home. Defendant testified that Ms. Lockhart did not get into the Lumina and that he did not see her get into any vehicle.

Defendant testified that they got home at approximately 3:00 a.m., after which he and Sanchez had sex for a couple of hours. He stated that it was not a sexual encounter tied to the Venus Transition. Defendant explained that Sanchez was familiar with the Venus Transition and had told him that it was when Venus covered the moon, and the moon turned red and looked like blood. He asserted that the experience he and Sanchez had together with respect to the Venus Transition was meaningful because when it happened, they went to a spot at the lake and had sex on the rocks while the Venus Transition was going on. Defendant noted that the Venus Transition was something that only occurred once every couple of thousand years.

After their sexual encounter, Defendant claimed that Sanchez then got a snack, got sick, and threw up, making a mess on the floor. Defendant stated that he cleaned it up. Afterward, Defendant and Sanchez eventually went to bed and dozed off occasionally. He did not think they slept. At approximately 7:30 a.m. to 7:45 a.m., Defendant got up because he was "too wired" and made coffee while Sanchez was lying down.

Defendant stated that he went outside and did his normal routine, including watering the garden and washing the dog. He tried throughout the day to get in touch with Ms. Morris so they could give her the dog. Later, Sanchez drove to her workplace, and Defendant accompanied her. They arrived at approximately 10:30 a.m. to 10:45 a.m. and went inside with the dog. Defendant set up his computer. Ten minutes later he left because he was told he had to take the dog outside. Defendant put the dog in the car, rolled down the window, and went back inside, after which he left at 11:30 a.m. and went home to Connecticut Avenue. He did routine things, including working in the yard, cleaning the shrubs, washing dishes, washing clothes, and neatening up. He claimed that he hurt his hand or finger doing yardwork. Defendant testified that he and Sanchez did not kill or dismember Ms. Lockhart.

Defendant asserted that he finally got in touch with Ms. Morris. Defendant testified that Sanchez got off of work at 7:00 p.m., and it took them 30 to 40 minutes to get home. When they got home, he called Ms. Morris and they drove to Winn Dixie to give Ms. Morris the dog. Defendant testified that they then went back home at approximately 8:00 p.m. to 8:20 p.m. Defendant claimed that when they got home, J.C., a friend of theirs who briefly lived with them at one time and would come by occasionally, was sitting on the bench on their porch. The friend told them he wanted to use their car, which he had done before. Defendant testified that the friend took the car and gave them $50 to use it. Sanchez told him if it was not back by "sunup," they would report it stolen. Defendant told him when he returned, to leave the keys under the mat. Afterward, Defendant and Sanchez went inside, did their normal routine, and went to sleep.

Defendant testified that on June 7, 2012, they awakened, and the car was in the driveway with the keys under the mat. That day, they went to visit "Jason and LeeAnn," shopped, and moved out of the

house. LeeAnn said they could stay with her.[18] On June 12, 2012, Defendant and Sanchez went to Hammond for Sanchez's sons' trophy ceremony. They went to a restaurant, but Defendant wanted to leave because Sanchez's mother was acting suspicious. After they left, five police officers were behind them, and Defendant told Sanchez to keep driving straight. The police pulled them over and told Sanchez to step out. They asked who the passenger was, and she responded that was her husband, Allen Rice. The police asked Defendant for his name and identification, but he said he left it at home.

Defendant testified that he opened the door and ran as fast as he could. One of the officers said he had a gun, and Defendant told him to just shoot him. They apprehended Defendant, arrested him and Sanchez, and took them to a substation. Defendant explained that they took him to Tangipahoa Parish, and that he ended up in Orange County, North Carolina and then in Otisville, New York. Defendant stated that he pleaded guilty to failure to register as a sex offender and was sentenced to Otisville.

Defendant asserted that he heard the phone calls and e-mails during trial, and that he said those words and did those things. He explained that he and Sanchez thought they contributed to Ms. Lockhart's murder because they talked Ms. Lockhart into going to the party, she ended up dead, and they received money from that. He thought they had done something wrong like committing negligent homicide. The police questioned him, but he denied knowing anything about Ms. Lockhart's murder and told them he wanted an attorney. Defendant testified that he was having problems with Sanchez while he was in Orange County and in Otisville because she could not stay faithful to him.

Defendant maintained that in the e-mails, the reference to cleaning up the mess they made meant he was helping her get her children back by hiding their drug use and their participation in the porn industry. In the e-mails, the reference to telling everything to the people meant telling the police and Sanchez's parents that he and Sanchez contributed to Ms. Lockhart's death. Defendant testified that at that time, he was threatening and manipulating Sanchez into staying with him. In the e-mails, where he said, "You're the one they'll fry, not me," he was just saying anything he could. When he said he was not coming back, he meant he would attempt suicide.

Defendant asserted that when he said he had to spring clean when Sanchez went to work meant he deleted the porn images they were going to put online for their escort services, deleted the pictures from Mississippi, and threw away the marijuana plants they were growing. He explained that he deleted those things because he knew that she could lose her children because of them. When Defendant said he was saving some things in case he needed them, he was trying to make her think he had kept some things to use against her if she did not straighten up.

Defendant testified that when he told Sanchez that he was not stupid or she would be in prison, he meant that they felt like they committed a crime and agreed to keep their mouths shut. Defendant stated that when he wrote about the boots, it was those boots that Sanchez asked Ms. Lockhart for. Defendant asserted that he had no idea if they still had those boots. He claimed he did not have them. When asked what he meant when he said, "I hold the

18. Defendant knew he had warrants for his arrest and was wanted by marshals. When he moved to New Orleans, he did not register as a sex offender.

cards, try me," and "Remember the panties with both your juices in them," Defendant claimed that was a typo and that it was supposed to say "our juices" because he and Sanchez had made a video of them having sex while Sanchez was wearing those boots.

Defendant admitted that on June 12, 2012, he did not mention to the police that he and Sanchez had Ms. Lockhart's boots. He was not sure if Sanchez had thrown them away, and he did not tell the police because he did not want them to be able to recover Ms. Lockhart's boots. Defendant agreed that he, Sanchez, and Ms. Lockhart were together when they left Temptations until they passed out of view of the last camera at Deanie's. He also agreed that he and Sanchez were in the Lumina that passed the license plate recognition camera at Loyola twenty-two minutes after he, Sanchez, and Ms. Lockhart passed in view of the camera at Deanie's.

Defendant admitted that all of the e-mails at trial were written either by him or Sanchez. He said Ms. Sparks was lying when she testified they were looking for a girl for a threesome. He testified that Mr. Del Rosario and Mr. Lucas were also lying. Defendant claimed that Ms. Dillmann was lying when she testified that they wanted to take her to a Super 8 motel in Metairie and then to his house. Defendant admitted that Sanchez's aunt was not there on June 6, 2012. He testified that he ran out the back door at Ms. Anderson's home because he thought he was in trouble for a reason other than Ms. Lockhart's murder. Defendant claimed that Lieutenant Moore was lying when she testified that he said he had a gun.

Defendant testified that he did not remember seeing Mr. Craft outside on June 6, 2012. He stated that he was outside and that it was possible he had a bag in his hand when Mr. Craft saw him. He

denied deleting photographs and files to hide evidence of Ms. Lockhart's murder. Defendant admitted that he used cleaning products to clean the house because Mr. Sanchez told them they had to move out. He also admitted that Mr. Sanchez was not happy about the condition they kept the car in. Defendant stated that Sanchez drove the car in the car wash. They used Windex in the car and vacuumed the trunk. Defendant admitted talking on the phone in codes, and that "Parvo" referred to them being persons of interest in the murder case. Defendant also admitted lying when he told Mr. Sanchez his ex-wife had died in a car accident. Defendant testified that he injured his hand when he was arrested. When he said they would "fry" Sanchez, it was a typo and should have been "cry." Defendant could not explain how the phrase "our juices" could incriminate Sanchez.

Defendant testified that he was admitting to the jury that he obstructed justice because he and Sanchez possessed Ms. Lockhart's boots and never turned them over to the police or to the family. He admitted that he made a conscious decision to withhold those boots from law enforcement to protect himself as the police investigated the homicide.

At the conclusion of the trial, the jury found Defendant guilty as charged on all counts. On July 6, 2015, defense counsel filed a motion for new trial. On July 9, 2015, Defendant filed a *pro se* motion for post-verdict judgment of acquittal, which defense counsel adopted. On July 9, 2015, Defendant's motions for new trial and post-verdict judgment of acquittal were denied after a hearing. Defense counsel waived sentencing delays.

Afterward, the trial court sentenced Defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on count

one; imprisonment at hard labor for 40 years on count two; and imprisonment at hard labor for 20 years on count three. The trial court ordered the sentence on count two to run consecutive to the sentence on count one, and it ordered the sentence on count three to run concurrent with the sentence on count two and consecutive to the sentence on count one. The trial court also ordered the sentences to run consecutively to any other sentence Defendant was serving. Following sentencing, the State filed a habitual offender bill of information on count two alleging Defendant to be a fourth felony offender, and Defendant denied those allegations.

Also on July 9, 2015, Defendant filed a timely motion for appeal that was granted on that day. On August 20, 2015, defense counsel filed another motion for new trial alleging new and material evidence. On September 3, 2015, defense counsel filed with this Court a Motion to Remand Appeal to Trial Court that was granted without prejudice by this Court for the purpose of hearing and ruling on defense counsel's motion for new trial. On January 19, 2016, Defendant filed a *pro se* supplemental motion for new trial. On that same date, defense counsel's motion for new trial and Defendant's *pro se* supplemental motion for new trial were denied after a hearing. The trial court also again denied Defendant's *pro se* motion for post-verdict judgment of acquittal on January 19, 2016.[19]

On January 21, 2016, Defendant filed a motion to quash the habitual offender bill. On January 22, 2016, a habitual bill hearing was held, after which the trial judge found Defendant to be a fourth felony offender.[20] The trial court vacated the original sentence on count two and resentenced Defendant under the ⌊36habitual bill statute to life imprisonment at hard labor without benefit of probation or suspension of sentence to run consecutive to the sentence on count one and concurrent with the sentence on count three. Defendant objected to the sentence and noted his intent to file an appeal. On that same date, Defendant filed a timely written motion for appeal that was granted that same date.[21]

## ASSIGNMENTS OF ERROR

On appeal, Defendant raises counseled and *pro se* assignments of error: 1) the evidence was insufficient to convict him of the charged offenses; 2) the trial court abused its discretion in permitting him to represent himself at trial; and 3) the trial court abused its discretion by denying his Motion for New Trial.

## LAW AND ANALYSIS

Sufficiency of Evidence

▋ In his *pro se* assignment, Defendant argues that the evidence was insuffi-

---

19. This motion was previously denied on July 9, 2015.

20. On February 2, 2016, the trial court issued a written Judgment and Reasons finding Defendant to be a fourth felony offender and denying Defendant's objection to the habitual offender bill. Also, La. C.Cr.P. art. 916 provides in pertinent part:
The jurisdiction of the trial court is divested and that of the appellate court attaches upon the entering of the order of appeal. Thereafter, the trial court has no jurisdiction to take

any action except as otherwise provided by law and to:
****
(8) Sentence the defendant pursuant to a conviction under the Habitual Offender Law as set forth in La. R.S. 15:529.1.

21. In that motion, Defendant moved to appeal the following: the verdict on June 19, 2015; the sentence imposed on July 9, 2015; the denial of the motion for new trial on January 19, 2016; and the sentencing as a habitual offender on January 22, 2016.

cient to support the verdicts.[22] He contends that the evidence was circumstantial and that the State failed to exclude all reasonable hypotheses of innocence. Defendant asserts that there was no eyewitness testimony, no DNA, and no forensic or physical evidence that Ms. Lockhart entered his car or home. He further asserts that the only testimony which actually linked him to Ms. Lockhart's murder was the self-serving testimony of two inmates, Mr. Del Rosario and Mr. Lucas. Defendant notes that Mr. Sanford, who testified at the hearing on the motion for new trial, has evidence that would impeach both of those witnesses. He points out that the instant case was highly publicized for three years, and that |₃₇Mr. Sanford testified at the hearing on the motion for new trial that both inmates had access to the internet through family members. Defendant contends that neither of these inmates informed officials of any additional information that was not available to the public through the internet.

In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Neal*, 00–0674 (La. 6/29/01); 796 So.2d 649, 657,

*cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).

■ In cases involving circumstantial evidence, the trial court must instruct the jury that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Mitchell*, 99–3342 (La. 10/17/00); 772 So.2d 78, 83; *State v. Washington*, 03–1135 (La.App. 5 Cir. 1/27/04); 866 So.2d 973, 977.

■ Defendant was convicted of second degree murder in violation of La. R.S. 14:30.1. Second degree murder is the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Because |₃₈specific intent is a state of mind, it need not be proven as a fact, but may be inferred from the circumstances and actions of the accused as well as the extent

---

**22.** When the issues on appeal relate to both the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. *State v. Hearold*, 603 So.2d 731, 734 (La. 1992). If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. *Id.* Alternatively, when the entirety of the evi-

dence, both admissible and inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must consider the assignments of trial error to determine whether the accused is entitled to a new trial. *Id.* Therefore, the sufficiency of the evidence is addressed before Defendant's other assignments. *See also State v. Nguyen*, 05–569 (La. App. 5 Cir. 2/3/06); 924 So.2d 258, 262.

and severity of the victim's injuries. *State v. Bone*, 12–34 (La.App. 5 Cir. 9/11/12); 107 So.3d 49, 58, *writ denied*, 12–2229 (La. 4/1/13); 110 So.3d 574.

Defendant was also convicted of obstruction of justice in violation of La. R.S. 14:130.1 and conspiracy to obstruct justice in violation of La. R.S. 14:130.1 and La. R.S. 14:26. La. R.S. 14:130.1 provides in pertinent part:

A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as hereinafter described:

(1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:

(a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers; or

(b) At the location of storage, transfer, or place of review of any such evidence.

Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination. La. R.S.

14:26(A). If the intended basic crime has been consummated, the conspirators may be tried for either the conspiracy or the completed offense, and a conviction for one shall not bar prosecution for the other. *Id.*

 "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La. R.S. 14:24. Mere presence at the scene of the crime does not make one a principal to the crime. *State v. Massey*, 11–357 (La.App. 5 Cir. 3/27/12); 91 So.3d 453, 463, *writ denied*, 12–0991 (La. 9/21/12); 98 So.3d 332. Only those persons who knowingly participate in the planning or execution of a crime are principals to that crime. *Id.* However, a principal may be connected to only those crimes for which he has the requisite mental state.[23] *Id.* at 464.

After review, we find that a rational trier of fact could have found that the evidence was sufficient under the *Jackson* standard to support the convictions.

At trial, employees of Stiletto's and Temptations established that on June 6, 2012, from approximately 1:00 a.m. to 2:00 a.m., Defendant and Sanchez were looking for a dancer to leave with them to either go and dance at a bachelor party or go home with them so the three of them could have sex. Ms. Dillmann, a dancer at Stiletto's, testified that she knew Defendant because he was the doorman at Stiletto's, and she knew Sanchez because she used to dance with her years before. Defendant and Sanchez eventually convinced Ms. Lockhart, who was desperate for money, to leave with them, promising her $500 if she would do so. Numerous witnesses, including Ms. Dillmann, testified that the

---

**23.** We note that the jury was instructed on the law regarding principals.

three of them left Temptations at approximately 2:00 a.m., and video surveillance cameras showed them leaving Temptations and walking several blocks until they disappeared from view at approximately 2:20 a.m.

At 2:43 a.m., a camera took a picture of the license plate of the green Chevrolet Lumina Defendant and Sanchez were traveling in at Loyola and Veterans in Kenner. Defendant and Sanchez were living at 2029 Connecticut Avenue in Kenner at that time. When Ms. Lockhart failed to return home, her boyfriend called several individuals looking for her. On the afternoon of June 6, 2012, Mr. Welch, the doorman at Temptations, called Defendant to find out what happened to Ms. Lockhart, and Defendant yelled at him saying he was not with her, did not know where she was, and that he "didn't do nothing," after which Defendant hung up on Mr. Welch.

On the evening of June 7, 2012, a torso washed ashore on a beach in Mississippi. Mr. Saucier reviewed missing person reports and believed the torso to be that of Ms. Lockhart. On June 9, 2012, a thigh, two calves, and a head were also found along the beach in Mississippi. DNA testing established that the remains belonged to Ms. Lockhart. An autopsy revealed that Ms. Lockhart died of a stab wound to the chest, that she sustained blunt force trauma, and that there was a lot of bruising on the body parts. The evidence at trial established that the perpetrators tried to hide the victim's identity and their role in her death by dismembering and disarticulating her body, cutting off her numerous tattoos, taking the body parts to Mississippi, and dumping them in the water. Also, the emails showed that Defendant and Sanchez agreed to cover-up their parts in Ms. Lockhart's disappearance.

During the investigation, it was learned that a picture of the license plate of the suspects' Lumina was taken on June 6, 2012, at 9:34 p.m. on I–10 eastbound in Slidell heading toward Mississippi and on June 6, 2012, at 11:51 p.m. on I–10 westbound in Slidell coming from Mississippi. It was also learned that approximately fifty minutes before the license plate was read at 9:34 p.m., Defendant and Sanchez were in the Lumina dropping off their dog to Ms. Morris in Kenner. The evidence showed that the driving distance from New Orleans to where the torso was found was approximately an hour and a half to two hours.

Ms. Anderson testified that in the days leading up to the arrest, there was a hard "cop knock" at her door, after which Defendant said he was going to get a Snickers bar, ran out the back door, and jumped over a fence; he returned a couple of hours later. On June 12, 2012, Defendant and Sanchez were stopped by police, and Defendant fled, indicating he had a guilty conscience. After he was apprehended, he told the officers he had a gun, and they should shoot him.

The investigation showed that on June 7, 2012, a program was run on Defendant's computer designed to clear internet history and registry information. It also showed that eleven photographs taken on May 3, 2012, near the beach in Pass Christian/Bay St. Louis, Mississippi were deleted from Defendant's cell phone on June 10, 2012. On June 7, 2012, Ms. Lockhart's torso was found on the beach in Bay St. Louis, and on June 9, 2012, other body parts were found along the beach in Pass Christian and Long Beach, Mississippi. Ms. Cessec indicated that Sanchez showed up at her place of employment on June 6, 2012, at 10:40 a.m. looking sick. Defendant was with her and had dirty feet.

It was established that the Connecticut residence and the Lumina were usually very dirty, but the day before the suspects

were arrested, both were clean. A neighbor saw Defendant at lunchtime on June 6, 2012, fumbling with a garbage bag and putting it in the trunk of the Lumina. When Defendant saw the neighbor, Defendant had a suspicious look on his face, and it looked like he was hiding something. Afterward, Defendant took the garbage bag out of the trunk, held it up around his chest with both hands, and went back inside the house. Detective Stromeyer testified that they found, in a burn pile in the backyard of the Connecticut residence, what appeared to be leather straps with a buckle on them, similar to the shoes Ms. Lockhart wore out of the locker room when she left Temptations, and that underneath the burn pile, they found a pair of women's panties. Mr. Normand testified that the video showed that Ms. Lockhart was wearing two pairs of underwear, and that the pair with the tassels washed ashore on the Mississippi beach.

Mr. Lane testified that it was not surprising that no physical evidence was recovered from the house or the vehicle as evidence could have been eliminated by cleaning and burning. There was evidence presented at trial that the house and the vehicle had been cleaned and that items had been burned in the backyard.

Significantly, Defendant and Sanchez exchanged several phone calls and emails that were incriminating. When they initially spoke on the phone on August 26, 2012, defendant told Sanchez to stay strong and "keep in codes" as they still had that "Mississippi sh*t" over their heads. On September 3, 2012, while speaking in codes about Parvo, they both discussed the intense and insane experience they had. On December 7, 2013, Defendant told her that what happened to him happened to her and vice versa and that the only reason he had been protecting her for the past year and a half was because he thought they were going to

be together. Defendant threatened to talk to the "people" on Monday.

On July 1, 2013, in an e-mail, Defendant told Sanchez they were in the same boat, and she could be where he was. On July 5, 2013, Defendant told Sanchez he was the only reason she was still out there. Later on that day, Defendant sent Sanchez an e-mail, stating that he wanted to tell everything to the "people" so she could suffer like he was, that he did everything to clean up the mess they made, that she would be the one they would "fry" not him, that acting crazy and blaming drugs would not help her, that he had to "spring clean" while she was at work, that he saved some things in case she went off course, and that he held all the "cards." Defendant also asked Sanchez in that same e-mail if she remembered the boots and the panties with "both your juices in them."

Additionally, Mr. Del Rosario and Mr. Lucas both basically testified that Defendant admitted to them that he and Sanchez killed the victim, dismembered her body, took it to Mississippi, and disposed of it in the water. Detective Stromeyer testified that prior to the interviews with those inmates, he did not provide them with information regarding Ms. Lockhart's case. He further testified that either or both of those inmates provided details that had not been published in any newspaper article or on television. Mr. Del Rosario asserted that he did not conduct research into the facts of this case before he went to law enforcement. Likewise, Mr. Lucas stated that he did not research this case and did not know anything about it other than what defendant told him.

On the other hand, Defendant denied that he and Sanchez killed Ms. Lockhart, dismembered her body, or disposed of it in Mississippi. He explained that Ms. Lockhart left with "Nick" to go to the bachelor party. He claimed that they loaned a

friend, J.C., the car after they dropped the dog off to Ms. Morris. Defendant asserted that he deleted items from his computer and phone to hide his and Sanchez's activities regarding drugs and pornography so she would not lose her children. He admitted that he and Sanchez wrote the e-mails presented at trial. Defendant claimed that he and Sanchez felt guilty because they thought they contributed to Ms. Lockhart's death by introducing her to Nick, after which she died. He accused several witnesses of lying. Defendant denied saying that they were looking for someone to take home to have sex with. He claimed that he cleaned the house because they were being forced to move and that they cleaned the car because they had to turn it over to Sanchez's father.

After considering the testimony and other evidence, the jury obviously found the State's witnesses credible and rejected Defendant's version of the incident. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. *State v. Rowan*, 97–21 (La.App. 5 Cir. 4/29/97); 694 So.2d 1052, 1056.

■ In light of the foregoing, we find that a rational trier of fact could have found that the evidence was sufficient under the *Jackson* standard to support the convictions of second degree murder, obstruction of justice, and conspiracy to obstruct justice and that every reasonable hypothesis of innocence was excluded. We also find that Defendant had the specific intent to kill based on the extent and severity of the victim's injuries, namely, that she was stabbed in her heart, and her body was dismembered. Even if Defendant was not the individual who fatally stabbed Ms. Lockhart, we conclude that a rational trier of fact could have found that he was a

principal to the homicide. Additionally, we find that a rational trier of fact could have found that Defendant and Sanchez clearly attempted to cover-up their crimes by cutting off the victim's tattoos, dismembering her body, taking her body parts to Mississippi, disposing of them in the water, and by agreeing in their e-mails and phone calls to not say anything to the police about their involvement.

## Self–representation

■ Appellate counsel for Defendant argues that the trial judge erred by permitting Defendant to represent himself at trial. He contends that there was no discussion of the overall circumstances of this case with its many shocking elements, including evidence of decapitation and dismemberment, Defendant's involvement in activities amounting to pandering, evidence that Defendant was a convicted sex offender, evidence of routine drug abuse, and evidence of Defendant's unusual sexual practices. He further contends there was no discussion regarding the problems attendant to the enormous amount of sensational pre-trial publicity, the difficulties in addressing the voluminous and complex scientific evidence, the challenges attendant to the selection of a jury in a case like this one, and no reference to Defendant's understanding of possible defenses. Appellate counsel asserts that the waiver colloquy failed to adequately explore Defendant's understanding of that waiver in view of the overall circumstances of this case. He further asserts that the record fails to show a knowing waiver of that fundamental right. As such, appellate counsel argues that the trial judge's error in this regard mandates reversal and remand for a new trial.

In his *pro se* brief, Defendant adds that he is from North Carolina, and therefore, he was not familiar with Louisiana law.

Defendant maintains that the trial judge's colloquy with him failed to include any questions concerning his mental health history, social background, what he reads, his medications, if he has ever been treated for a mental condition or been hospitalized, if he has ever received governmental assistance for any disabilities, his prior experience with criminal trials or procedures, the charges against him and possible punishments, why he wanted to represent himself, and his possible defenses. Defendant notes that the trial judge had to keep reminding him during trial that he was testifying instead of cross-examining a witness on the stand. He contends that at that point, the trial judge should have informed him that he was unable to represent himself. Defendant asserts that the trial judge also failed to question him as to whether there were any discrepancies between him and appointed counsel regarding defenses, who to call as witnesses, whether he would testify on his own behalf, etc. As such, Defendant argues that his waiver of counsel was not knowingly and intelligently made, and therefore, this matter should be remanded for a new trial.

The State responds that the trial court did not abuse its discretion when it accepted defendant's waiver of counsel after a lengthy colloquy.

On June 5, 2015, Defendant filed a *pro se* Motion to Dismiss Counsel based on ineffective assistance of counsel. In that motion, Defendant said he was asking that his trial counsel, John Benz, be removed from his case. Defendant explained that his counsel had not put forth the assistance that was needed for such a high profile case. He stated that he had been imprisoned in Jefferson Parish for over 210 days and had only spoken to Mr. Benz eight times. Defendant claimed that his counsel declined when he asked to be involved in his motions and to let him see them before they were filed. Defendant further claimed that counsel had been negative towards this case from the beginning, and that counsel had stated in court that he had a lot of other cases, had not had the opportunity to review the case and asked for a continuance.

On June 15, 2015, the first day of trial, a hearing was held on Defendant's Motion to Dismiss Counsel. Mr. Benz stated that he was assigned this case in August of 2014, and that he was provided with discovery and met with Defendant in October of 2014. Mr. Benz asserted that he had the opportunity to review that discovery, to prepare, and to conduct his own investigation with the assistance of his staff and/or investigators. He believed that he was adequately prepared to represent Defendant effectively in this case.

Afterward, Defendant testified at the hearing that his date of birth was September 19, 1972, that he graduated from high school with a 99.9 GPA, that he scored well in standardized tests, and that he had held a job. When asked what was the highest position he had ever held with a company, Defendant replied, "I was managers," and "I have been managers." The trial judge asked Defendant whether he understood that self-representation was almost always unwise and might be detrimental to his case, and defendant replied, "Yes, sir." Defendant indicated that he had never attended law school and did not have a bachelor's degree, but that he understood that when the proceeding went forward, the Louisiana Code of Evidence and the Code of Criminal Procedure would apply. He said he was a "little" familiar with the Codes of Evidence and Criminal Procedure.

Defendant stated that he had never studied in a law school setting. He indicated that he understood that he was not entitled to and would not receive any spe-

cial treatment by the court if he represented himself; that he would be subjected to the same rules that govern the attorneys; that he must follow all rules of law, procedure, and evidence; that the prosecution would be represented by an experienced attorney who would not "go easy" on him; that he would receive no more library privileges than any other prisoner; that he would have no extra time for preparation and no staff of investigators; that if he became disruptive, the right to self-representation might be taken away; and that whatever the outcome of the trial, he would not be able to claim he received inadequate representation.

Defendant also indicated that he had given this matter a lot of thought since his arrest; that he had discussed his decision with family, friends, and counsel; and that counsel had advised him against representing himself. He stated that he understood that the charges filed against him were second degree murder, obstruction of justice, and conspiracy to commit obstruction of justice; that it was the State's burden to prove his guilt beyond a reasonable doubt; that the penalty for second degree murder was life imprisonment; that he would be subject to a habitual offender proceeding, even if he was convicted of one of the lesser charges; that the possible penalty as a habitual offender was life imprisonment; and that he was positive he wanted to represent himself.

The trial judge subsequently stated that it was his intention to appoint Mr. Benz and Mr. Scott as advisors and assistants to Defendant with regard to his self-representation. Defendant indicated he was willing to accept them as advisors and assistants. Defendant asked the trial judge whether he could change his mind at any time and "resign," and the trial judge responded affirmatively. However, the trial judge informed Defendant that if that

should occur, Mr. Benz and Mr. Scott would take over his representation and that Defendant would not be co-counsel, and Defendant indicated he understood.

Afterward, the prosecutor noted that discovery was provided to Mr. Benz in advance of Defendant being transported into Jefferson Parish; that Defendant received enough information while he was incarcerated at Otisville; that Defendant was aware of the two potential witnesses who were inmates at Otisville; that Mr. Benz, his investigator, and Mr. Scott had been to the District Attorney's office on more than one occasion and had the opportunity to review all of the evidence; that Mr. Benz explored the possibility of a plea; and that Mr. Benz vigorously represented Defendant in his failure to register as a sex offender charge which resulted in Defendant being treated as a third rather than as a fourth felony offender and a lesser sentence than the trial judge recommended.

The trial judge said that Mr. Benz had done a good job in representing Defendant. Defendant indicated that he understood that but still wished to represent himself. He said he was aware that the trial judge did not think this was a good idea. The trial judge then told Defendant he always thought it was a bad idea for a defendant to represent himself since that individual is not familiar with the Code of Evidence and the Rules of Procedure; however, the trial judge stated that Defendant had the right to do so. Defendant indicated that knowing all of that he wished to represent himself in this matter, that he fully understood what they had discussed, and that he had no questions.

Afterward, the trial judge granted Defendant's Motion to Dismiss Counsel and his request to represent himself. However, the trial judge asserted that Mr. Benz was adequately prepared for trial and had been

intimately involved in this case since he had been appointed. The trial judge then appointed Mr. Benz and Mr. Scott as standby counsel. He explained that counsel would be available at reasonable times before and during trial to answer any questions Defendant might have or to give legal advice.

The record reflects that Defendant represented himself during a hearing on a pre-trial motion, during opening statements, during *voir dire*, and during the cross-examination of several witnesses, including Mr. Faulk, Dr. Troxclair, Mr. Normand, Susan Johnson (an employee of T–Mobile), Mr. Trawicki, Detective Adams, Ms. Suarez, and Mr. Welch. During the cross-examination of Ms. Dillmann, Defendant approached the bench and said, "I'm in way over my head." Defendant also stated that he wanted to defend the case but realized when he was trying to question Mr. Welch it would be detrimental to his case if he did not withdraw and ask to have Mr. Benz and Mr. Scott represent him.

The trial judge subsequently recessed Ms. Dillmann's testimony and conducted a hearing outside the presence of the jury. Defendant testified at that hearing that he wanted Mr. Benz and Mr. Scott to represent him in this matter. Mr. Benz indicated that he would be ready to proceed after he reviewed the remaining witnesses' statements. The trial judge subsequently recessed trial for the day to give defense counsel time to prepare. Afterward, the jury was brought back in, and the trial judge informed them that Defendant had exercised his right to counsel and that Mr. Benz and Mr. Scott would undertake Defendant's representation for the remainder of the trial.

The next day, defense counsel moved for a mistrial, arguing that when representing himself, Defendant made many mistakes that, if made by a regular attorney, would have been considered ineffective representation. Defense counsel further argued that they were at a disadvantage because they had not been able to cross-examine the witnesses or pick the jury. Defense counsel asserted that although Defendant decided to represent himself "with full enlightenment" by the court, he did not think Defendant knew "what the heck he was doing when he did that." The prosecutor responded that Defendant made his own decision after being advised of the consequences. He argued that it was no action by the State that brought Defendant to the decision to represent himself and the later decision to not represent himself.

The trial judge denied the motion for a mistrial, finding that Defendant had the benefit of counsel frequently in selecting the jury as well as the "actual procedure" through trial. He said it appeared to him that almost all of Defendant's objections were prompted by assistant counsel. He added that he was very liberal in allowing assistant counsel to help Defendant at bench conferences providing information and/or bases for objections. The trial judge asserted that he entered into a colloquy with Defendant prior to trial and informed him that whatever the outcome, he would not be able to claim ineffective representation.

Additionally, the trial judge asserted that he did not think Defendant was ineffectively represented when he represented himself. The trial judge thought that Defendant asked numerous questions that were worthwhile to his defense, and that Defendant pointed out different issues during cross-examination. The trial judge noted that Defendant did not have any difficulty with cross-examination until he tried to impeach either the last or second to last witness prior to breaking the day before. He found that ultimately Defen-

dant was able to obtain from that witness the testimony he wanted to obtain mostly from the witness' voluntary statements. The trial judge thought that Defendant was not prejudiced in that situation, which was "perhaps the most glaring time when Mr. Speaks was struggling to represent himself."

The Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution give a defendant the right to counsel as well as the right to defend himself. A defendant may represent himself only if he makes an unequivocal request to represent himself and knowingly and intelligently waives his right to counsel. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *State v. Bridgewater*, 00–1529 (La. 1/15/02); 823 So.2d 877, 894, *cert. denied*, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003); *State v. Bruce*, 03–918 (La. App. 5 Cir. 12/30/03); 864 So.2d 854, 857. Assertion of that right "must also be clear and unequivocal." *State v. Bell*, 09–0199 (La. 11/30/10); 53 So.3d 437, 448, *cert. denied*, 564 U.S. 1025, 131 S.Ct. 3035, 180 L.Ed.2d 856 (2011).

In accepting a waiver of counsel, the trial court should advise the defendant of the nature of the charges, the penalty range for the charges, and the dangers and disadvantages of self-representation, such as the failure to recognize objections to inadmissible evidence and the inability to adhere to technical rules governing trials. *Bruce*, 864 So.2d at 857. In addition, the court should inquire into the defendant's age, education, and mental condition and should determine according to the totality of circumstances whether the accused understands the significance of the waiver. *Id.*

Once the defendant has made an unequivocal request to represent him-

self, the trial court must determine whether the defendant is competent to waive counsel and is "voluntarily exercising informed free will." *State v. Santos*, 99–1897 (La. 9/15/00); 770 So.2d 319, 321. The competency at issue is a defendant's competence to waive his right to counsel and not his competence to represent himself. *Id.*

Whether a defendant has knowingly, intelligently, and unequivocally asserted the right to self-representation must be determined on a case-by-case basis, considering the facts and circumstances of each case. *State v. Leger*, 05–11, (La. 7/10/06); 936 So.2d 108, 147–48, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007). The question of whether a defendant properly waived his or her right to counsel should not be judged on what happened subsequent to the waiver of counsel; rather, it is the record made in waiving the right to counsel that is determinative of whether this right was properly waived. *State v. George*, 98–1149 (La. App. 5 Cir. 3/30/99); 743 So.2d 685, 689.

The trial court is given much discretion in determining whether the defendant's waiver was knowing and intelligent. *State v. LaGarde*, 07–288 (La.App. 5 Cir. 10/30/07); 970 So.2d 1111, 1120, *writs denied*, 07–1650 (La. 5/9/08); 980 So.2d 684 and 07–2412 (La. 5/16/08); 980 So.2d 706. An appellate court should not reverse the trial court ruling absent an abuse of its discretion. *Id.*

In the instant case, we find that the trial judge did not abuse his discretion in granting Defendant's request to represent himself. During the *Faretta* hearing, the trial judge determined Defendant's age, education, some employment history, and his familiarity with the legal system. The trial judge also ascertained that Defendant understood the nature of the charged offenses, as well as the possible life sentence

for second degree murder if convicted and the possible life sentence as a habitual offender. The trial judge advised Defendant of the dangers and disadvantages of self-representation, and Defendant indicated he understood them. Defendant was advised by the trial court that he must follow all rules of law, procedure, and evidence. Additionally, Defendant clearly and unequivocally stated that he wanted to represent himself.

Defendant was informed that by choosing to represent himself he would be giving up his right to counsel; however, the trial judge appointed Mr. Benz and Mr. Scott as standby counsel to give legal advice and answer questions for Defendant, which they did. It is also noted that although Defendant represented himself during *voir dire* and the cross-examination of the State's first eight witnesses, he was represented by counsel during the cross-examination of the State's next 20 witnesses who testified after he reasserted his right to counsel. Moreover, we find, as the trial judge did, that Defendant adequately represented himself. Defendant made some relevant points during his cross-examination of the witnesses and some relevant objections, some of which were sustained. Additionally, the record shows that Mr. Benz and Mr. Scott participated in some bench conferences and assisted Defendant in making some objections.

In light of the foregoing, we find that under the totality of the circumstances, Defendant's waiver of his right to counsel was knowingly, intelligently, and voluntarily made, and the assertion of the right to represent himself was clear and unequivocal. As such, we further find that the trial judge did not err by allowing Defendant to represent himself.

## Denial of Motion for New Trial

Defendant argues that the trial court erred by denying his motion for new trial based upon newly discovered evidence that would have impeached the credibility of two critical State witnesses, Christian Del Rosario and Trevor Lucas.

The State responds that the trial court did not abuse its discretion in denying the motion for new trial in light of the overwhelming evidence against Defendant and Sanchez and the demonstrated falseness of various claims made by Elijah Sanford.

The record reflects that on August 20, 2015, defense counsel filed a motion for new trial in accordance with La. C.Cr.P. art. 851, *et seq.* In that motion, defense counsel stated that on July 17, 2015, he received a letter dated July 12, 2015, from Kendal Green of the Orleans Parish Public Defenders Office and that the purpose of that letter was to forward a letter from Elijah Sanford, an inmate and paralegal at the federal prison in Otisville, New York. These letters were attached to defense counsel's motion. Defense counsel said that Mr. Green apologized for the lateness of the letter, explaining that due to errors in Mr. Sanford's letter, some time passed before it found its way to someone who recognized the reference to the Speaks case. Defense counsel asserted that Mr. Sanford's letter was dated and postmarked on June 10, 2015. He further asserted that in his letter, Mr. Sanford revealed crucial information regarding Mr. Lucas, who testified at trial in the instant case.

In that motion, defense counsel noted that Mr. Sanford disputed Mr. Lucas' allegation that Defendant told him facts about the instant case. He stated that Mr. Sanford said that Mr. Lucas received most of his information from his father's search of the internet. Mr. Sanford also said that when Mr. Lucas' facts did not fit the investigators' facts, Mr. Lucas was given corrected information by these investigators. Mr. Sanford stated in his letter that he knew this to be true because

Mr. Lucas would either send for him or find him and report the progress. Mr. Lucas would also attempt to seek advice from Mr. Sanford, which Mr. Sanford said he provided. Mr. Sanford claimed that Mr. Lucas wanted him to have one of his family members set someone up for him so that Mr. Lucas' 17–year sentence could be reduced. Mr. Sanford further claimed that his reward for doing so was to be $100,000 to be secured in escrow.

Defense counsel argues in his motion that the State's case was completely circumstantial, which was bolstered by the testimony of Mr. Lucas that Defendant confessed to him. He further argues that Mr. Sanford's testimony would discredit Mr. Lucas. As such, defense counsel avers that Mr. Sanford's information was new and material and that, notwithstanding the exercise of reasonable diligence, was not discovered before or during trial, and if the evidence had been introduced at trial, it would probably have changed the verdict. In conclusion, defense counsel moved for a new trial for Defendant. On January 15, 2016, Defendant filed a *pro se* supplemental motion which raised issues similar to those raised in defense counsel's motion.[24]

On January 19, 2015, a hearing was held on defense counsel's motion for new trial. Mr. Sanford testified via video conferencing that he was currently residing at a federal prison in Otisville. He stated that he was in federal prison because he committed a robbery in 2006. His sentence was approximately 12 years. Mr. Sanford testified that he sent a letter to the Public Defender's Office last year and in that letter, he made accusations against individuals who were going to testify in the in-

stant case, one of whom was Mr. Lucas. He explained that Mr. Lucas was housed in the same unit as he was for many months, and that he came to know Mr. Lucas' family. He did not know Defendant and had no correspondence or phone calls with him or his relatives. Mr. Sanford testified that he was a paralegal for the prison and that he assisted the prisoners with their legal research occasionally. He explained that he did that voluntarily, and that he had assisted Mr. Lucas. He did not perform legal work for Mr. Lucas to obtain a reduction in his sentence, but he did give him advice. Mr. Sanford asserted that Mr. Lucas received a 17–year sentence, which Mr. Lucas thought was illegal, and that he should have received seven years. Mr. Sanford gave Mr. Lucas case law and citations to help Mr. Lucas' attorneys.

Mr. Sanford claimed that Mr. Lucas initiated conversation about Mr. Speaks and that the initial conversation was that Mr. Lucas was looking for ways to receive a reduction in sentence by trying to get information on people. Mr. Sanford further claimed that after coming to him and him declining, Mr. Lucas came back months later mentioning the name of "Christopher Speaks." The gist of that conversation was that Mr. Lucas "accosted" Defendant, and that Defendant stated that although the Louisiana prosecutors believed he had committed a murder, he did not. Defendant allegedly told Mr. Lucas that the prosecutors did not have enough information to secure indictments or bring him to trial or they would have done it already. He said this conversation with Defendant happened in December of 2014. Mr. Lucas told Mr. Sanford he wanted to elicit as much information as he could from Defen-

---

**24.** The trial judge found that, to the extent that Defendant's *pro se* pleading supplemented the motion for new trial, there were no new issues to be addressed and to the extent that it raised issues better suited for post-conviction relief, it could be refiled later as an appropriate post-conviction pleading and addressed in that fashion.

dant. He claimed Mr. Lucas told him that Defendant was not giving any information, so Mr. Lucas did some research with some assistance.

Mr. Sanford testified that Mr. Lucas told him his father was assisting him with the research and that an agency was assisting him as well. Mr. Lucas allegedly told Mr. Sanford that he had some help in the education department at the Otisville prison and that he did Google research. Mr. Sanford testified that it was absolutely prohibited for prisoners to have access to a computer to do Google research. Mr. Sanford indicated that Mr. Lucas later informed him he believed he had enough information to initiate communication between him and the Louisiana prosecutors. He further indicated that Defendant did not give him any information.

Mr. Sanford stated that after he got the information, he made contact with Security Investigative Services at Otisville prison to initiate communication with the State of Louisiana. Mr. Lucas believed he had enough information to proceed with a "Rule 35" as it is known in federal court.

Mr. Sanford submitted that he knew Mr. Del Rosario because the two of them facilitated some programs at the prison and because they arrived at that prison on the same day on the same bus. Mr. Sanford claimed that Mr. Lucas told him he wanted to help someone who had a life sentence, but Mr. Sanford did not know the identity of that person. Mr. Sanford found out later that person was Mr. Del Rosario. He explained that Mr. Lucas told him that he gave Mr. Del Rosario information against Defendant to attempt to reduce Mr. Del Rosario's life sentence. Mr. Sanford testified that Mr. Lucas and Mr. Del Rosario both told him that they were exchanging information.

Mr. Sanford said he had a conversation with Mr. Del Rosario one time and that Mr. Del Rosario told him he and Mr. Lucas were talking and trying to get a reduction in their sentences. Mr. Sanford claimed that Mr. Del Rosario said that he would "lie on Jesus" to receive a reduction. Mr. Sanford noted that Mr. Lucas told him he had interviews with the State of Louisiana officials and convinced them he had enough information. Mr. Lucas was concerned that he had gaps in his story. Mr. Sanford stated that Mr. Lucas told him that the prosecutor and the investigators were in the room with him, but the prosecutor left because he did not want to be a witness. Mr. Sanford claimed that Mr. Lucas told him the investigators were filling in the blanks for him but did not tell him everything. Mr. Lucas explained that the blanks involved the blood on the truck and other things. Mr. Sanford testified that Mr. Del Rosario did not tell him he obtained information from Mr. Speaks, but Mr. Del Rosario did tell him that he knew Mr. Speaks. He further testified that at one point, Mr. Lucas was agitated because Mr. Del Rosario was taken to court before him, and Mr. Lucas was concerned they would not use his testimony.

Mr. Sanford asserted that he reported Mr. Lucas to the prison authorities and told them that Mr. Lucas was going to commit perjury at Defendant's trial. Mr. Sanford further asserted that Mr. Lucas later told him that it was his testimony in Defendant's case that secured the indictment and that it was his testimony that convicted Defendant. Mr. Lucas told Mr. Sanford he had no regrets about committing perjury. Mr. Sanford stated that he still saw Mr. Lucas at the Otisville prison, but he did not have conversations with Mr. Del Rosario after Defendant's trial because Mr. Del Rosario received a lot of "push-back." Mr. Sanford testified he had nothing to gain by providing this information, that no one had promised him any-

thing, and that he had not been paid for his testimony. He claimed he only came forward because he wanted to ensure Defendant received a fair trial. Mr. Sanford testified that the $100,000 referred to in his letter had no relevance to Defendant and that Defendant's situation came after the $100,000 offer. He admitted that in his letter, he did not mention anything about Mr. Del Rosario.

Special Agent Patrick Strawn testified at the hearing that he worked for the FBI in New Orleans. He further testified that he and other agents provided assistance to the Hancock County Sheriff's Office and the Kenner Police Department in connection with Ms. Lockhart's death. During the investigation, Agent Strawn traveled to a federal correctional center in Otisville, New York, to follow up on information provided by Mr. Del Rosario and Mr. Lucas regarding the Lockhart case. With respect to the first trip, he went with detectives or deputies from Hancock County, and with respect to the second trip, he went with two detectives from the Kenner Police Department and a prosecutor. During the first trip, they met with Defendant. During the second trip, he met with Mr. Del Rosario and Mr. Lucas. Agent Strawn testified that he had never met with Mr. Del Rosario or Mr. Lucas before, and to his knowledge, neither the prosecutor nor the Kenner police officers met with Mr. Del Rosario or Mr. Lucas. An audio recording was made of that interview. Agent Strawn insisted that there was no substantive interview or discussion held with Mr. Lucas prior to the recording being turned on. He identified State's Exhibit 1, Speaks Motion for New Trial, as a transcript of that interview.

Agent Strawn testified that he never provided Mr. Lucas with any facts that would improve upon the story he was telling. He explained that he did not have a personal relationship with Detective Stromeyer or Detective Jesse Johnson of the Kenner Police Department, the officers who were with him during the interview. Agent Strawn maintained that at no point during the interview did he or the other officers provide Mr. Lucas with any information, and Mr. Lucas was not encouraged to provide any type of false information to them. Following his interview with the other officers, Agent Strawn participated in a second interview with Mr. Lucas and the prosecutor that was not recorded. During that second interview, the information Mr. Lucas provided was consistent with the information he provided during the first interview. Agent Strawn testified that none of them had any substantive discussion with Mr. Lucas prior to the tape going on. He explained that he asked Mr. Lucas open-ended questions, so as to not provide him with any information. Agent Strawn testified that he also interviewed Mr. Del Rosario and that he did not give him any information regarding the case. They became aware of Mr. Lucas when they received notification either through the prisoner or an attorney that Mr. Lucas and Mr. Del Rosario wished to provide them with information regarding the instant case. That is what prompted the trip to Otisville for the interviews. The decision was made to record the interviews from the very beginning of contact because they did not want to miss anything, and those inmates wanted consideration for their sentencing so they wanted to ensure everything was completely "above-board."

During the hearing, the trial court took judicial notice under La. C.E. art. 201 of all evidence presented during the course of Defendant's trial in order to determine whether the jury would have likely reached a different result had they heard the impeaching evidence.

Following the testimony, defense counsel and the prosecutor argued their respective positions. Defense counsel argued that had the jury heard this new evidence, it would more than likely have changed the jury's verdict as the State's case was wholly circumstantial. The prosecutor responded that the defense fell short of meeting its burden of showing that the new evidence would probably have changed the verdict. He noted that the testimony of Mr. Lucas and Mr. Del Rosario were not the only evidence and that the State had introduced a very large amount of evidence, both direct and circumstantial. The prosecutor stated that Defendant made admissions while speaking with his co-conspirator by e-mail and by phone, and Defendant also made comments to the doorman who called him the next day. The prosecutor said that substantial circumstantial evidence was established in the timeline of Defendant's and Sanchez's activities coupled with admissions made by Defendant during interviews with the Hancock County Sheriff's Office and Agent Strawn in the September 2013 interview. The prosecutor also argued that Mr. Sanford's credibility would be dimly viewed had he been called as a witness at trial. He contended that Mr. Sanford's assertion that law enforcement personnel conspired against Defendant using a federal convict they had never met before would not have been credible.

After hearing arguments of counsel, the trial judge found that the new evidence was discovered after trial, based upon the letter being sent to the wrong Public Defenders' Office. The trial judge also found that the failure to discover the evidence before trial was not attributable to lack of diligence on behalf of defense counsel or his office. The trial judge further found that the evidence was material to the issues at trial. He stated that the issue was whether the evidence was of such a nature that it would probably produce a different verdict in the event of a retrial. The trial judge stated in pertinent part:

In this particular case there was an abundance of evidence outside the testimony of Mr. del Rosario and that of Mr. Lucas, specifically Mr. Lucas, I guess in given the particular motion that we're dealing with today, that would lead to the Jury's determination that, in fact, Mr. Speaks was guilty.

There was the emails containing Mr. Speaks' statements back and forth with that of his co-defendant. There were [sic] the time line as presented by the Defendant, there was the physical evidence, or lack thereof in some respects, which was also evidence in the particular matter presented by the Prosecution, the lack of any blood evidence, the lack of any evidence of any type inside the vehicle or under the vehicle, for that matter, the corroborating evidence of the knowledge of the Defendant, Defendant's knowledge of the area where the body parts were ultimately dropped based upon the photographs were introduced, again, the witness' statements alone along with the meals that were submitted, there was sufficient evidence, I believe, to show that had this impeachment evidence been introduced, the jury would not have likely reached a different verdict based upon that impeachment evidence alone, as I do think, considering the trial as a whole there was sufficient evidence that the jury's verdict would not have been likely different than what was the ultimate determination of that jury [sic].

So for those reasons and based upon the entirety of the evidence submitted at trial, along with the testimony offered here today, the defendant's Motion for New Trial is denied at this time.

 The decision on a motion for a new trial rests within the sound discretion

of the trial judge and his ruling will not be disturbed on appeal absent a clear showing of an abuse of discretion. *State v. Henry*, 13–558 (La.App. 5 Cir. 3/26/14); 138 So.3d 700, 718, *writ denied*, 14–962 (La. 2/27/15); 159 So.3d 1064.

La. C.Cr.P. art. 851 provides in pertinent part:

|₆₁A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.

B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:

\* \* \*

(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.

\* \* \*

La. C.Cr.P. art. 854requires that the motion contain allegations of fact, sworn to by the defendant or his counsel, showing:

(1) That notwithstanding the exercise of reasonable diligence by the defendant, the new evidence was not discovered before or during the trial;

(2) The names of the witnesses who will testify and a concise statement of the newly discovered evidence;

(3) The facts which the witnesses or evidence will establish; and

(4) That the witnesses or evidence are not beyond the process of the court, or are otherwise available.

La. C.Cr.P. art. 854.

 In addition to the conditions set forth in La. C.Cr.P. art. 854, four other requirements must be met for a motion for new trial: (1) the evidence must have been discovered since the trial; (2) failure to learn of the evidence at the time of trial must not be due to defendant's lack of diligence; (3) it must be material to the issues at the trial; and (4) it must be of such a nature that it would probably produce an acquittal in the event of a retrial. *Henry*, 138 So.3d at 718. The trial court's application of these precepts to newly discovered evidence is entitled to great weight, and its denial of a motion for new trial will not be disturbed on appeal absent a clear abuse of that discretion. *Id.* In evaluating whether newly|₆₂discovered evidence warrants a new trial, the test employed is not whether another jury might return a different verdict but whether the new evidence is so material that it ought to produce a verdict different from that rendered at trial. *Id.* An application for a new trial on the ground of newly discovered evidence should be viewed with extreme caution. *Id.*

In the instant case, we find that the four requirements set forth in Article 854 have been met. Defense counsel's motion for new trial contains allegations of fact, as sworn to by defense counsel in an affidavit attached to the motion, which shows that notwithstanding the exercise of reasonable diligence by Defendant, the new evidence was not discovered before or during the trial. Also, the affidavit contains the name of the witness, Elijah Sanford, who would testify and a concise statement of the newly discovered evidence. Additionally, the motion for new trial details the facts which Mr. Sanford would establish. Lastly, the affidavit provides that Mr. Sanford is not beyond the process of the court and is otherwise available.

Further, we find that the first three requirements set forth in *Henry, supra*, have been met. First, the letter from Mr.

Sanford alleging that Mr. Lucas and Mr. Del Rosario lied on the witness stand was discovered since the trial. Second, the failure to learn of the evidence at the time of trial was not due to Defendant's lack of diligence. Third, this evidence was material to the issues at the trial, since Mr. Lucas and Mr. Del Rosario provided direct evidence of Defendant's guilt, in that Defendant allegedly confessed to them that he and Sanchez killed and dismembered Ms. Lockhart.

However, with respect to the fourth requirement, we find that this evidence was not of such a nature that it would probably produce a different verdict in the event of a retrial. There was a large amount of other evidence admitted at trial that overwhelmingly showed that a rational trier of fact could have found under the *Jackson* standard that Defendant was guilty of the second degree murder of Ms. Lockhart, obstruction of justice, and conspiracy to obstruct justice, as was set forth extensively earlier in our discussion. Thus, we do not find the trial court abused its discretion in denying Defendant's motion for new trial.

Error Patent Review

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975) and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990), and no errors requiring corrective action were found.

## DECREE

For the foregoing reasons, Defendant's convictions and sentences are affirmed.

**AFFIRMED**

LILJEBERG, J., CONCURS WITHOUT REASONS